IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA

UNITED STATES OF AMERICA,             CRIMINAL ACTION

              vs.                     No. 24-mj-623

JOSHUA LEE ATWOOD,

        Defendant.

_____

  Transcript of DETENTION HEARING held on April 24, 2024
   United States District Court, Pittsburgh, Pennsylvania
  BEFORE:  HONORABLE PATRICIA DODGE, DISTRICT MAGISTRATE

APPEARANCES:

For USA:                         Nicole Vasquez Schmitt, Esq.
                                 Assistant U.S. Attorney
                                 U.S. Attorney's Office
                                 700 Grant Street
                                 Pittsburgh, PA 15219

For the Defendant:               Kathryn Kitt Dyer, Esq.
                                 Federal Public Defender's Office
                                 1001 Liberty Avenue
                                 Pittsburgh, PA 15222-3716

Court Reporter:                  Karen M. Earley, RDR-CRR
                                 Joseph F. Weis, Jr.
                                 U.S. Courthouse
                                 Room 6260
                                 700 Grant Street
                                 Pittsburgh, PA 15219
                                 412-201-2660

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

- - -

|  | DIRECT | CROSS |
|---|---|---|
| GOVERNMENT WITNESS: | | |
| Special Agent Sarah | 5 | 41 |

P R O C E E D I N G S

(April 24, 2024, 9:10 a.m.  In open court.)

THE COURT:  Good morning.

Please be seated.

We are here for several proceedings here today in the matter of United States versus Joshua Lee Atwood at Docket 24-623.

Would counsel identify themselves, please.

MS. VASQUEZ SCHMITT:  Good morning, Your Honor.  Nicole Vasquez Schmitt on behalf of the United States.

THE COURT:  Good morning.

MS. DYER:  Good morning.  Kathryn Dyer on behalf of Mr. Atwood.

THE COURT:  Good morning.

I think the first thing that had been scheduled was an identity hearing, and I believe based upon the waiver that I have in front of me, that Mr. Atwood is waiving his right to an identity hearing and production of the warrant.  Is that correct, Ms. Dyer?

MS. DYER:  That's correct.

THE COURT:  All right.  We will then proceed with the other matters scheduled here today which is preliminary examination and detention hearing.

4

Before we do that, Ms. Dyer, I understand that your monitor is not working.  I apologize for that.  I don't think there is anything short term we can do about that.

If you object to proceeding without it working, certainly, I will hear you out.  Otherwise, we'll do our best to accommodate you in terms of being able to see things at least on the large TV.

MS. DYER:  Yes.  I will let the Court know if there is any issue as we move forward.

THE COURT:  Ms. Vasquez Schmitt, are you ready to proceed?

MS. VASQUEZ SCHMITT:  Yes, Your Honor.  I have one witness who will testify to facts relevant to the preliminary hearing and the detention hearing, but for the preliminary hearing, I would also proffer the complaint Statement of Facts.

The Court found probable cause.  So I would offer that as a finding of probable cause.

THE COURT:  All right.  I appreciate that.  I assume there is no objection to that, Ms. Dyer.

MS. DYER:  Not to the admission of it.

THE COURT:  Then it is admitted and I do have it in front of me.

MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

I did mark that as Government Exhibit 1.

THE COURT:  All right.

MS. VASQUEZ SCHMITT:  Your Honor, the government calls Sarah Stirrup.

THE COURT:  Please step forward to be sworn.

THE DEPUTY CLERK:  Good morning.

Please raise your right hand.

SPECIAL AGENT SARAH STIRRUP, a witness herein, having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please take the witness stand.  Please state and spell your name for the court reporter.

THE WITNESS:  My name is Sarah Stirrup. S-a-r-a-h, S-t-i-r-r-u-p.

DIRECT EXAMINATION

BY MS. VASQUEZ SCHMITT:

Q.   Good morning.

A.   Good morning.

Q.   Can you please tell the Court how you are employed.

A.   I'm employed as a special agent with the Federal Bureau of Investigation.

Q.   How long have you been a special agent with the FBI?

A.   I started as a new agent in June and I have been assigned to the Pittsburgh office November 1.

Q.   So you started in June of 2023?

A.   Yes, ma'am.

Q.   What did you do for work before you joined the FBI?

A.   I was a fraud analyst doing telecommunications fraud management solutions in the Washington, D.C. area and oversees in the private sector.

Q.   At the FBI, what type of investigations do you work on?

A.   I worked several types of investigations, drugs and gangs, street gangs.  I would assist with crimes against children --

THE COURT REPORTER:  Could you slow down.

THE COURT:  Yes.  If you could, take your time, slow down.  Feel free to speak into the microphone so we can all hear you.

THE WITNESS:  I apologize.

THE COURT:  That's all right.

A.   Also, domestic terrorism investigations.

Q.   Have you worked on the investigation involving the defendant Joshua Atwood?

A.   Yes, ma'am.

Q.   Have you reviewed the complaint Statement of Facts filed in this case?

A.   Yes, ma'am.

Q.   Are you the affiant on that document?

A.    Yes, ma'am.

Q.    So you're familiar with the facts of that document, right?

A.    Yes, ma'am.

Q.    So the Court is obviously familiar with January 6, 2021, but can you just briefly tell us what happened at the U.S. Capitol on January 6, 2021.

A.    Yes, ma'am.  On January 6, 2021, there was a joint session of the United States Congress.  So the House of Representatives and the Senate were meeting to certify the vote of the electoral college from the 2020 presidential election.

Q.    And on that day -- so, is there an exterior plaza at the U.S. Capitol Building?

A.    Yes, ma'am.

Q.    Was that closed or open to the public that day?

A.    It was closed to the public.

Q.    Did a large crowd gather that day?

A.    Yes, ma'am.

Q.    Can you just briefly describe that.

A.    The vote was -- the certification of the election was going on around the afternoon, so a large crowd started to gather around 2:00, 2:30 p.m. in the afternoon on the grounds of the Capitol and the Capitol police were there as well to maintain the crowd and stop

them from entering and disrupting the proceedings.

Q.   You mentioned the capitol police, can you describe what that is?

A.   There's police, a federal police department assigned to protect the U.S. Capitol.

Q.   Were there barricades set up that day?

A.   Yes, ma'am.

Q.   What did the crowd do?

A.   They were pushing against the barricade to try to enter into the U.S. Capitol.

Q.   Was the crowd authorized to enter the building that day?

A.   No, ma'am.

Q.   Did the crowd go through any weapons or security checks?

A.   No, ma'am.

Q.   Were there other law enforcement agencies that came to assist the capitol police?

A.   Yes, ma'am.

Q.   Can you briefly describe that.

A.   Metropolitan Police Department, the Capital Police Department, the Virginia State Troopers were all there to help assist, among other law enforcement agencies.

Q.   Were there injuries that day as a result of the riots?

A.    Yes, ma'am.

Q.    Were there injuries to law enforcement?

A.    Yes, ma'am.

Q.    Is it fair to say multiple injuries to law enforcement?

A.    Yes, ma'am.

Q.    Was there damage to property?

A.    Yes, ma'am.

Q.    Were there some deaths reported to be linked to the events that day?

        MS. DYER:  Your Honor, I'm going to object to this line of questioning.  It is not specific in any way to Mr. Atwood.

        THE COURT:  Overruled.

Q.    Were there some deaths reported to be linked to the events of that day?

A.    Yes, ma'am.

Q.    Was the FBI able to obtain video and still images of the events on January 6 outside and inside the capitol?

A.    Yes.

Q.    Have you reviewed stills and videos as part of your investigation?

A.    Yes, ma'am.

Q.    In general, is the FBI investigation into the

events of January 6 still ongoing?

A.    Yes, ma'am.

Q.    Let's take a look if we can -- if I can have the screen -- at the Statement of Facts that's been admitted as Government Exhibit 1.

I'm going to direct you to Page 3.  There are some images there.  Do you see where it has a red circle and it says "tunnel?"

A.    Yes, ma'am.

Q.    It'll scroll down a little bit for the Court on this page.  Can you describe what these images are showing?

A.    Yes, ma'am.  This is the lower west tunnel entrance to the Capitol.  The significance of this entrance is that when the president elect is to be sworn in on the day of inauguration, this is the entrance that he or she steps out of to be sworn in to office.

Q.    Hopefully "she" some day, right?

So the lower west tunnel, can you explain to the Court what happened at the lower west tunnel just in summary, a brief summary of what happened at the lower west tunnel on January 6, 2021.

A.    Yes, ma'am.  So a large crowd had gathered on this terrace to try to enter through the lower west tunnel. The different police departments, the Capitol Police,

Metropolitan Police, Virginia State Police had assembled a barricade to try to stop unauthorized individuals from entering the capitol through this tunnel.

Q.   Did the rioters arm themselves?

A.   With objects that could be used as weapons, yes, ma'am.

Q.   And were there some assaults that took place by the rioters on the law enforcement who had gathered at the tunnel?

A.   Yes, ma'am.

Q.   Let's move to talking about the defendant Joshua Atwood.  Did the FBI -- we talked generally how there was some video and images that you reviewed?

A.   Yes.

Q.   Did what you reviewed show an individual who was assigned a BOLO AFO number?

A.   Yes, ma'am.

Q.   What is a BOLO AFO number?

A.   Be on the lookout for assault on a federal officer.

Q.   Can you just briefly describe kind of the -- what are the source of these videos and images that you reviewed of this BOLO AFO individual?

A.   The different video we reviewed was open source video.  It was capitol CCV, close circuit video and body worn camera footage from different officers that were

present and a part of the barricade.

Q.    When you say "open source video," does that just mean members of the public video?

A.    Yes, ma'am.

Q.    The individual who you investigated, what was this individual wearing that day?

A.    The individual was wearing dark pants that looked to be like jeans.  They were wearing several jackets that looked like navy blue, dark black and camouflage and then underneath as a base layer a navy blue what appeared to be a Trump 2020 shirt and a backpack and dark gloves.

Q.    Let's take a look at the images in the Statement of Facts starting on -- I don't know if they are actually numbered but this is the PDF Page 4.  It's image 4 that I'm going to start looking at for the record.

         This image 4, is this the individual you were describing who you were assigned to investigate?

A.    Yes, ma'am.

Q.    Let's take a look at maybe some of the other images.

         Is the yellow circle here on five drawn on the individual you were investigating?

A.    Yes.

Q.    Is this the backpack you described (indicating)?

A.    Yes, ma'am.

Q.    Maybe image 7, I'm just going to zoom in on image 7.  Is this the individual here in the yellow circle that I have my cursor over his face, is this the individual you were investigating?

A.    Yes, ma'am.

Q.    And again in image 9 with the yellow circle, is that the individual you were investigating (indicating)?

A.    Yes, ma'am.

Q.    Did the FBI receive a tip about the identity of this individual?

A.    Yes.

Q.    What was the tip?

A.    The tip was submitted identifying the individual through facial recognition with publicly available photos of the same individual.  So they did a facial recognition comparison of the individual with a publicly released mugshot from I believe 2010, 2011.

Q.    What was the name that the tip said, who is this?

A.    Joshua Lee Atwood.

Q.    Did the FBI later confirm that tip, that it was Joshua Lee Atwood?

A.    Yes, ma'am.

Q.    While working on confirming the tip, did the FBI talk to a local law enforcement officer who was familiar

with the defendant?

A.    Yes, ma'am.

Q.    Can you describe that -- was that you who talked to that officer?

A.    Yes, ma'am.

Q.    Can you described what you learned from him?

A.    I spoke with Donald Blankenship.  He is a patrolman from New Cumberland, West Virginia.  He was the officer on scene of an incident regarding Mr. Atwood from 2023 and he was also assisting as one of the arresting officers when Mr. Atwood was arrested in May of 2023.

Q.    So he had arrested Mr. Atwood in May of 2023?

A.    Yes.  He was also with him in court, so he had several interactions with Mr. Atwood.

Q.    We will come back later in talking about that incident.  With respect to the identification, was this officer shown some of these images of this person at the Capitol on January 6?

A.    Yes, ma'am.

Q.    What did he say?

A.    He identified the individual as Mr. Atwood.

Q.    Based on your investigation today and your review of the footage, what did the defendant do on January 6, 2021?

A.    The defendant was present on the Capitol grounds and used various objects to throw against law enforcement in the lower west tunnel.

Q.    Did he at some point make it into the building?

A.    Yes, ma'am.

Q.    Can you describe that.

A.    There is a Senate, I believe, Terrace Room Mezzanine.  If I can reference the Statement of Facts for the exact room number.

Q.    Sure.

A.    It's Senate Terrace Room 2 Mezzanine.  You can see it in image 45 of the Statement of Facts.

Q.    Let me get that with you.

A.    So this room --

Q.    Is it image 46, is it underneath?

A.    Yes, you can see the room from image 45 and then you can see Mr. Atwood inside the room in image 46.

Q.    Can you explain in image 45 where the room is?

A.    Yes, ma'am.  If you are looking at the lower west tunnel, it's on the left side of the entrance to the lower west tunnel.  There is no door.  Individuals who were present at the Capitol on January 6, 2021 had used baseball bats and other objects to break the window and many people tried to enter the room, found the room to be barricaded, and then exited the room.

Q.    Did they break this window here (indicating)?

A.    Yes, ma'am.

Q.    When I say "here," did they break the window on image 45 that is shown in the yellow circle?

A.    Yes, ma'am.

Q.    Then what is image 46?

A.    Image 46 shows Mr. Atwood and others inside of Senate Terrace Room 2 Mezzanine.

Q.    We're going to go over some of the videos.  Did you as part of your prep today did you review Government Exhibits 5 through 12?

A.    Yes, ma'am.

Q.    Are they the videos or clips of videos that you reviewed in your investigation?

A.    Yes, ma'am.

        MS. VASQUEZ SCHMITT:  Your Honor, I would move to admit Government Exhibits 5 through 12.

        THE COURT:  Is there any objection?

        MS. DYER:  No, Your Honor.

        THE COURT:  All right.  Exhibits 5 through 12 are admitted.

        MS. VASQUEZ SCHMITT:  Thank you.

Q.    Let's watch Government Exhibit 5 and then I may have some questions.  Well, do you remember, and if you need to refer to the Statement of Facts, that is fine,

what time approximately was Mr. Atwood's conduct that day?

A.   I believe it was around 4:50 p.m. through 5:10 p.m.

Q.   Thank you.  Let's take a look at Exhibit 5.

(Whereupon, Government Exhibit 5 was played for the Court.)

Q.   I'm going to stop the video there.  I think you can touch your screen.  Can you point to where Mr. Atwood is in this video?

A.   (Witness indicates.)

Q.   Now, there is a button to clear.  Do you see that?

A.   Yes.

Q.   Okay.  Let's me start that again.  Here where my cursor is, is that the person you had circled in yellow (indicating)?

A.   Yes, ma'am.

(Whereupon, Government Exhibit 5 video continued.)

Q.   What did we just see?  Based on your investigation, what did Mr. Atwood just do?

A.   We see a small object consistent with a bottle being thrown into the police barricade in the lower west tunnel.

Q.   Being thrown by Mr. Atwood?

A.   Yes, ma'am.

Q.    I'll continue the video.

           (Whereupon, Government Exhibit 5 video continued.)

Q.    Do you know what happened to the bottle that was thrown?  Do you know based on you're investigation?

A.    I do not recall.

Q.    I'm going to refer to the Statement of Facts.  Did you see on the Statement of Facts right before image 14, Page 8 of the PDF?

A.    Yes, ma'am.

Q.    Can you read the statement here.

A.    Yes, ma'am.  The bottle was captured by MPD BWC footage as it flew into the tunnel and struck an officer positioned near the back of the tunnel.

Q.    Does that refresh your recollection about what happened with the bottle?

A.    Yes, ma'am.

Q.    And did Mr. Atwood throw something else in the video?

A.    Yes, ma'am.

Q.    What was it?

A.    Some object consistent with a metal pole.

Q.    Let's take a look at Exhibit 6.

           (Whereupon, Government Exhibit 6 was played for the Court.)

Q.    Did you see the pole in Exhibit 6?  What was the source of Exhibit 6?

A.    It was body worn camera footage from an officer present.

Q.    What happened to the pole in that video?

A.    It flew through the police barricade and hit officers in the police barricade.

Q.    Is that the pole that was thrown by Mr. Atwood?

A.    Yes, ma'am.

Q.    Then the Statement of Facts talks about after that, it's page 11 and 12 of the PDF, what happened essentially after the pole?  If you want to look at Page 11.  Were there some other things he threw after he threw the pole?

A.    Yes, ma'am.

Q.    Exhibit 21, does that include a small square object?

A.    Yes, ma'am.

Q.    Then what am I looking at Page 12?

A.    Another small object.

Q.    Okay.  Thank you.  What did he arm himself with next, if you remember?

A.    I believe it was a wooden pole.

Q.    Let's take a look at Government Exhibit 7.

            (Whereupon, Government Exhibit 7 was played

for the Court.)

Q.   On Exhibit 7 -- let me fast forward -- the pictures are also in the Statement of Facts.  Can you kind of circle for the Court where -- I guess it's hard.  Let me move forward.  Can you just describe who was Mr. Atwood in that video?

A.   He is here (indicating.)

Q.   Did you just see him in that clip?

A.   Yes.

Q.   Can you describe who he was in the video and what he was doing around that time?

A.   He is on the left corner of the tunnel.  I circled him.  He is using a long wooden pole and using it in a stabbing motion towards the police barricade.

Q.   Did the pole hit anything inside the tunnel?

A.   The police barricade.

Q.   Did it hit any officers?

A.   Yes.

Q.   Can you describe that.

A.   The wooden pole was used to strike officers and hit an officer in the neck.

Q.   Can we look at the Statement of Facts again which is Government Exhibit 1.  Can you just read here starting with "specifically."

A.   Specifically, Atwood used the long wooden pole to

strike two MPD officers who were part of the frontline and used their riot shields to protect themselves from Atwood's strikes.  Atwood then momentarily pulled the pole back before striking another MPD officer on the top of the officer's helmet by the faceplate.  Atwood then pulled the pole back and threw it in the direction of two MPD officers hitting their shields and ricochetting off the south wood.

Q.    Okay.  Thank you.

We'll take a look at Exhibit 8.  Does Exhibit 8 show what you just read and described from the Statement of Facts?

A.    Yes, ma'am.

(Whereupon, Government Exhibit 8 was played for the Court.)

Q.    Can you describe what we saw in Government Exhibit 8?

A.    We saw the wooden pole being used by Mr. Atwood.

Q.    And what was the source of the video for Exhibit 8?

A.    Body worn camera footage from police officers present.

Q.    Let's take a look at Government Exhibit 9.

(Whereupon, Government Exhibit 9 was played for the Court.)

Q.    Can you circle where Mr. Atwood is here for the

Court.

A.   Yes (indicating.)

Q.   I will play the rest of the video.

(Whereupon, Government Exhibit 9 was continued to be played.)

Q.   Can you show where Mr. Atwood is now?

A.   Yes, ma'am.  (Witness indicates.)

Q.   So after the wooden pole, as we saw in Exhibit 9, did he arm himself with something else?

A.   Yes, ma'am.

Q.   What was it?

A.   It was consistent with a piece of scaffolding.

Q.   Before that, what was he holding in the video, in the beginning of the video?  Does it refresh your recollection -- we can watch the video again -- but he had something else that he was pushing at officers in the beginning of the video.

A.   Yes, ma'am.

Q.   What was that?

A.   A riot shield.

Q.   Where did he get that riot shield?

A.   It appeared to be a riot shield used by officers from the barricade that day.

Q.   I think you testified then he armed himself with a metal pipe, is that what you testified?

MS. DYER:  Objection to the characterization.

MS. VASQUEZ SCHMITT:  I can rephrase.

Q.   What happened next?

A.   In the video that we just watched, he appeared to pick up a piece of metal that was consistent with scaffolding.

Q.   Did you notice anything about the item consistent with scaffolding that he picked up?

A.   It appeared to be heavy to lift.

Q.   What happened to the pipe or the item that you described after it was thrown?

A.   Can we review the Statement of Facts to refresh my memory?

Q.   Sure.  Here we go on Page 18 of the PDF after image 40, can you read that for the Court.

A.   Yes, ma'am.  Moments later, Atwood threw a metal pipe into the tunnel which first struck an MPD officer's riot shield, then hit an assisting Virginia State Police Trooper's head and neck, see images 41 through 44.

Q.   Thank you.  I'll play what is Government Exhibit 10.

(Whereupon, Government Exhibit 10 was played for the Court.)

Q.   Did you hear the voice that said "everyone should be ashamed of yourself?"

A.    Yes, ma'am.

Q.    Who was that?

A.    Mr. Atwood.

            (Whereupon, Government Exhibit 10 continued to be played for the Court.)

Q.    What was the source of that video?

A.    Body worn camera footage from officers present.

Q.    Does that show kind of the opposite of what we saw in Exhibit 9 from the view of the officers?

A.    Yes, ma'am.

Q.    I'll play Exhibit 11.

            (Whereupon, Government Exhibit 11 was played for the Court.)

Q.    As you saw in the video, can you describe with respect to what Mr. Atwood did?

A.    We can see Mr. Atwood throwing the metal object consistent with a piece of scaffolding.

            (Whereupon, Government Exhibit 11 continued to be played for the Court.)

Q.    So from Government Exhibits 10 and 11 and maybe other video that wasn't clipped for today, were you able to hear certain statements that were attributed to Mr. Atwood?

A.    Yes, ma'am.

Q.    Are they on PDF Page 16 of the Statement of Facts?

A.   Yes, ma'am.

Q.   Can you just read those three bullets, please, into the record.

A.   Fuck off.  You guys are all pieces of shit.

Everyone of you should be ashamed of yourself. Everyone of you mother fuckers are pieces of shit, betraying your country like this.  Why would you betray your country.  Do you love our country or do you want civil communist fuck.

Pieces of fucking shit.  Everyone of you mother fuckers.

Q.   We just have one more video.  This next video that is marked as Exhibit 12.  Have you reviewed that?

A.   Yes, ma'am.

Q.   When was that discovered?

A.   Only recently.

Q.   Was there something you saw that -- let's just play it and I'll ask you my follow-up question.

(Whereupon, Government Exhibit 12 was played for the Court.)

Q.   What was the source of this video?

A.   It was an open source video.

Q.   Someone in the crowd?

A.   Yes, ma'am.

(Whereupon, Government Exhibit 12 continued to

be played for the Court.)

Q.    What did we just see on the video?

A.    We saw the back of Mr. Atwood picking up a metal object consistent with a piece of scaffolding and throwing it towards the police barricade.

Q.    So then this video continues on from that point in time?

A.    Yes, ma'am.

(Whereupon Government Exhibit 12 continued to be played for the Court.)

Q.    Did Mr. Atwood throw something else after he threw the pipe?

A.    Yes, ma'am.

Q.    What did it appear to be?

A.    It was consistent with what looked like a speaker, a large black object.

Q.    That is not in the Statement of Facts, right?

A.    No, ma'am.

Q.    Why is that?

A.    This video was recently discovered.

Q.    In these type of investigations, is that common?

A.    Yes, ma'am.

Q.    Based on your discussions with other people at the FBI?

A.    Yes, ma'am.  The FBI is continuing to investigate

the events of January 6, 2021.

Q.   I think you already testified, you explained, so we don't have to go over it again.  He did make it inside the Capitol Building, correct?

A.   Yes, ma'am.

Q.   Let's move on to talk about the day he was arrested on these charges.  Did you have a warrant for the defendant's arrest?

A.   Yes, ma'am.

Q.   Was he arrested pursuant to that warrant on April 17, 2024?

A.   Yes, ma'am.

Q.   Where was he arrested?

A.   At 1436 State Route 18 Burgettstown, Pennsylvania, 15021.

Q.   Did you have a search warrant for that residence?

A.   Yes, ma'am.

Q.   Did you have a search warrant for another residence as well?

A.   Yes, ma'am.

Q.   What was that?

A.   58 Main Street Extend, Burgettstown, Pennsylvania, 15021.

Q.   Why did you have search warrants for two different residences?

A.    We believed Mr. Atwood to be residing at the second address I just stated, 58 Main Street Extend due to different government identifications associating him with that address.

We later learned through our investigation, that he actually resided at a different address in Burgettstown, the first address I just listed, 1436 State Route 18.

Q.    And that's where he was found on the day of his arrest?

A.    Yes, ma'am.

Q.    Where does his driver's license say he lives?

A.    58 Main Street Extend, Burgettstown, Pennsylvania.

Q.    The place where he wasn't?

A.    That's correct.

Q.    When was that issued, if you remember, his driver's license?

A.    The most recent driver's license was issued with that address September 2023.

Q.    Just a few months ago?

A.    Yes, ma'am.

Q.    So in your investigation there was some conflicting information about where he was living?

A.    Yes, ma'am.

Q.    Were there guns found in his home?

A.    Yes, ma'am.

Q.    Can you describe that, please.

A.    There were three weapons found in a safe in his home, two nine millimeter handguns, one automatic rifle.

Q.    Did the FBI run a registration record for those guns?

A.    Yes, ma'am.

Q.    What did you find?

A.    One of the handguns was registered to Brittany Lee Toomey and the other two weapons, the other handgun and the automatic rifle did not have registrations returned.

Q.    Did you find anything else near the guns or related to the guns?

A.    There was also body armour in the safe and ammunition.

        THE COURT:  What did you just say?

        THE WITNESS:  And ammunition.  I'm sorry, Your Honor.

        THE COURT:  Thank you.

Q.    I haven't asked you this before and I don't know what you are going to say.  What was the size of the body armour?  Was there anything of note or you're not sure?

A.    It was for an adult.

Q.    Was there alcohol in the home?

A.   Yes, ma'am.

Q.   Were there drugs in the residence?

A.   Yes, ma'am.

Q.   Can you describe that, please.

A.   There was marijuana in the form of a weed pen and in other packaging and devices to consume, so a bong and a pipe.

Q.   Have you reviewed Government Exhibit 3?

A.   Yes.

Q.   What is that?

A.   It's a photo from the bedroom of Mr. Atwood and Ms. Brittany Toomey.

Q.   When was it taken?

A.   The day of the search warrant, April 17, 2024.

        MS. VASQUEZ SCHMITT:  Your Honor, I would move to admit Government Exhibit 3.

        THE COURT:  Any objection?

        MS. DYER:  No, Your Honor.

        THE COURT:  Exhibit 3 is admitted.

        MS. VASQUEZ SCHMITT:  Thank you.

Q.   I'm showing you what has been admitted as Government Exhibit 3.  What are we looking at here on kind of the nightstand in the bedroom?

A.   A bong.

Q.   Did you say a bong?

A.   Yes, ma'am.

Q.   What is a bong?

A.   It's a device to smoke marijuana out of.

Q.   Who else lives in this house?

A.   Mr. Atwood, Ms. Brittany Toomey and their two children who are five and two years old.

Q.   Does it appear to you this bong would be within reach of the children?

MS. DYER:   Objection.   Calls for speculation.

THE COURT:   Overruled.

A.   Yes, ma'am.

Q.   So we have been talking a lot of his conduct that day.   Why was he not arrested until last week when the conduct was in 2021?

A.   I received this case as the case agent in January 11, 2024.   So I began investigating it in January 2024.

The FBI, as we discussed, is still investigating thousands of people that attended the events on January 6 of 2021, and we are, as we also discussed, receiving new content continuously.

Q.   The Capitol footage alone, do you have a sense of what is the volume of that?

A.   There's thousands of hours of footage that needs to be reviewed by every case agent assigned to investigate each individual present.

Q.    So since you received the case, how many months has it been from when you received it to the arrest?

A.    January 11 until April 17.

Q.    Approximately three months?

A.    Approximately three months.

Q.    Did you believe it was important to work quickly to get him arrested?

A.    Yes, ma'am.

Q.    Did you run a check on the defendant's employment through the Pennsylvania Department of Labor?

A.    Yes, ma'am.

Q.    Is the report you received marked as Government Exhibit 4?

A.    Yes, ma'am.

        MS. VASQUEZ SCHMITT:   Your Honor, I would move to admit Government Exhibit 4.

        THE COURT:   Any objection?

        MS. DYER:   No objection.

        THE COURT:   Exhibit 4 is admitted.

Q.    What does this report show?

A.    This report shows that the last reported income to the State of Pennsylvania regarding Mr. Atwood is from quarter 1, 2020.   He was employed by David Calderon.

Q.    What are the wages listed?

A.    $5,760 per quarter.

Q.    Who is Mr. Calderon, based on your knowledge?

A.    Mr. Calderon owns Dave's Heating and Air Conditioning and he also owns several properties in Washington County, Pennsylvania.

Q.    We're going to move to talking about an April 2023 incident involving the defendant.  Are you aware of an incident involving the defendant on April 28, 2023 in Chester, West Virginia?

A.    Yes, ma'am.

Q.    Can you briefly explain that incident to the Court.

A.    In April of 2023, Mr. Atwood was in West Virginia and he went to a restaurant called The Crazy Donkey to have a discussion with the restaurant owner regarding wages Mr. Atwood believed he was owed for services he provided to the restaurant owner.

They disagreed over the amount owed. Mr. Atwood attempted to take money from the register. The restaurant owner attempted to stop him.  A concealed firearm on the person of Mr. Atwood was dropped on the ground during this physical interaction --

Q.    Let me stop you there.  When you say the concealed firearm, was that reported to be concealed on Mr. Atwood?

A.    Yes, ma'am.

Q.    Okay.  Go ahead.  Thank you.

A.    Mr. Atwood proceeded to pull out a concealed knife and used the knife on the restaurant owner.

Q.    When you say "used the knife on," what do you mean?

A.    He stabbed him in the arm.

Q.    Go ahead.

A.    Mr. Atwood then fled the scene of the violent confrontation.  He retrieved the concealed firearm before he fled the scene and left the State of West Virginia.

Q.    How did the report characterize Mr. Atwood at the time?

A.    Armed and dangerous.

Q.    Can you describe what you know about the injuries to the victim?

A.    The report that was written by the Chester Police Department states that the officers who responded to the scene of the violent confrontation had to provide a tourniquet to the victim to his arm to stop the bleeding.

Q.    What did the police do after he fled?

A.    The police attempted to locate and contact Mr. Atwood.  They reported calling his phone number several times leaving messages.  They reported looking up his address and contacted the local police in the area to try to locate him at 58 Main Street Extend.

Q.   Do you know the phone number?

A.   I know the last four digits.

Q.   Okay.  That would be great.

A.   1030.

Q.   Did it start with 317?

A.   Yes, ma'am.

Q.   How did they get that phone number?

A.   They got that phone number from the restaurant owner who previously was in contact with Mr. Atwood.

Q.   Was he reported to be a client of Mr. Atwood's?

A.   Yes, ma'am.

Q.   Did they call him?

A.   Yes, ma'am.

Q.   Did they leave a message?

A.   Yes, ma'am.

Q.   What did they say?

A.   They asked Mr. Atwood to call them back.

Q.   Did he?

A.   No, ma'am.

Q.   So then I think you said they found the Main Street address from his identification documents?

A.   Yes, ma'am.

Q.   Then what happened?

A.   They asked the local police department, I believe, Hanover Township Police Department, to locate Mr. Atwood

at that address.  The officers from the local police department responded that the house looked as though it was not -- it was inhabited.

Q.   Then did they ask another law enforcement agency to become involved with helping to locate him?

A.   Yes, ma'am.

Q.   Who was that?

A.   The Chester Police Department asked for the help of the United States Marshal Service Fugitive Task Force to locate Mr. Atwood and apprehend him for the violent altercation that occurred in West Virginia.

Q.   Based on your work as an FBI agent, what is the marshal fugitive -- maybe it's apparent from the name, but what does the marshal's fugitive task force do?

A.   To track down fugitives.

Q.   Was he arrested?

A.   Yes, ma'am.

Q.   When was that?

A.   He was arrested on May 25, 2023.

Q.   Let me back up.  Do you remember what he -- was he charged in West Virginia for something?

A.   Yes, ma'am.

Q.   What was it based on your memory?

A.   Malicious assault and robbery.

Q.   How long was it from the incident to his arrest?

A.   Almost one month.

Q.   He was considered a fugitive for a month?

A.   Yes, ma'am.

Q.   Did Atwood later tell officers anything about the Main Street address?

A.   Yes.  He told the magistrate court in West Virginia that 58 Main Street Extend address is his mailing address that is affiliated with his work and he sleeps and lives at 1436 State Route 18.

Q.   What happened when Mr. Atwood appeared before the magistrate?

A.   I don't understand the question.

Q.   Was he released?

A.   Yes, ma'am.

Q.   Do you know the details of the release?

A.   The judge set the bail at $100,000.

Q.   Was he released with any conditions?

A.   Yes.

Q.   What were those that you know of?

A.   The conditions that I can recall are not to consume alcohol, not to have contact with the victim from the incident.

Q.   Did it also say he could not possess alcohol?

A.   Yes, ma'am.

Q.   Did it prohibit him from possessing or consuming

anything else?

A.   Narcotics that were not prescribed.

Q.   Was he later indicted on those charges?

A.   Yes, ma'am.

Q.   Are they pending?

A.   Yes, ma'am.

          MS. VASQUEZ SCHMITT:   I'm almost done, Your Honor.

Q.   Very briefly, did you review the bond report that was prepared in connection with this case?

A.   Yes, ma'am.

Q.   Did you see anything that you hadn't known about before?

A.   Yes, ma'am.

Q.   What was that?

A.   Two additional criminal history records that we had not previously seen.

Q.   Did they just not appear when you ran his criminal history?

A.   Yes.   They were not present in the criminal history report that we ran.

Q.   Was one of them from 2011 where he was charged with -- convicted of recklessly endangering another person?

A.   Yes, ma'am.

Q.   Did you investigate that at all?

A.   I contacted the police department that issued the charges.  They sent the police report this morning.  So I didn't have a chance to read the report but I spoke with the chief of police from the charging agency.

Q.   Is this the one they sent?  Did you receive this one?

A.   From 2011?

Q.   Yes.

A.   No, ma'am, I haven't received it yet.

Q.   You haven't received it yet?

A.   No, ma'am.

Q.   Just very briefly for the Court, what did the officer tell you that he recalled about that incident?

A.   The officer told me that Mr. Atwood was at his house or at a house at the time of the incident and another individual was attempting to repossess a motor vehicle.  He said Harley-Davidson.  That's what the chief of police told me.

         Mr. Atwood came out of the house holding a handgun, fired the handgun at the ground, at the gravel near the other individual attempting to repossess the motorcycle and then pointed the gun at the other individual after firing one shot.

Q.   Did you also speak to officers about the car

accident that occurred in 2021?

A.    Yes, ma'am.

Q.    What did you learn there, anything of note?

A.    I spoke with the officer on the scene for a three-vehicle motor vehicle accident that occurred I believe in February of 2021.  I received the report this morning for this incident.

      The officer wrote in the report that what was later identified as Mr. Atwood was driving a truck that hit another vehicle and caused an accident.  There was snow on the road at the time and that's it.

Q.    Did the report note that the officer smelled anything in Mr. Atwood's vehicle?

A.    Yes, ma'am.

Q.    What was it?

A.    Marijuana.

Q.    Did Mr. Atwood make any statements about the marijuana?

A.    The report stated that Mr. Atwood stated he did not know what marijuana smelled like.

Q.    Did the report also -- was there a tow truck that came to the scene?

A.    Yes, ma'am.

Q.    Did the report note anything about Mr. Atwood saying anything to the tow truck driver?

A.    There was a verbal disagreement between the tow truck driver and Mr. Atwood.

Q.    Was there something about the tow truck driver -- what was the subject matter -- you don't have to say the exact words but what was the subject matter of the disagreement relating to?

A.    I don't recall the exact words because I just received the report this morning.

Mr. Atwood had made a comment about him just -- the tow truck driver just following orders like the Jews did in the concentration camps.

Q.    Was the tow truck driver Jewish?

A.    Yes.

MS. VASQUEZ SCHMITT:  No further questions.

THE COURT:  Thank you.

Cross-examination.

MS. DYER:  Yes.  May I have just a moment.  I did receive a report this morning and I would like to take a minute with my client.

THE COURT:  That's fine.

MS. DYER:  Thank you.

(Pause in the proceedings.)

CROSS-EXAMINATION

BY MS. DYER:

Q.    Good morning, Special Agent Stirrup.

A.   Good morning, ma'am.

Q.   I have the criminal complaint that you drafted and a couple of text messages.  Was there anything else that you drafted related to this case?

A.   I have written 302s related to this case.

Q.   Have you turned those over to the government?

A.   Yes, ma'am.

Q.   And did those 302s include your perception and reactions to witnesses that you spoke with?

A.   I guess I don't understand the question.

Q.   Like characterizations of the information that you were receiving or the people you were receiving information from?

A.   They documented steps in the investigation.

Q.   And they included statements from other people and your impressions?

A.   They included statements from other people.

Q.   And not your impressions?

A.   I guess I don't understand.  Is there something specific you are asking about?

Q.   Sure.  Sometimes in reports folks will characterize somebody's demeanor, somebody's behavior, whether or not there are indicators of veracity or reliability.  Were those in your reports?

A.   I believe so.

MS. DYER:  I would ask that the government turn over those reports?

MS. VASQUEZ SCHMITT:  I did.  They were all in the U.S. Access folder.  I don't have Internet but they were all in that folder.  There was a ZIP folder with all of her 302s.

MS. DYER:  Your Honor, I apologize.  I need to ask for a brief recess to take a look at what I have received.  I did not on first look find any 302 documents.  Would it be permissible to have a five-minute recess?

THE COURT:  We can take a five-minute recess so you can review what was sent to you.  We are in recess until 10 minutes after 10.

(Whereupon, a recess was taken.)

THE COURT:  May I see counsel at sidebar, please.

(Sidebar discussion held as follows:)

THE COURT:  I understand there may be an issue and I thought we should address that now so that we can decide how we are going to proceed today.  What is the issue?

MS. VASQUEZ SCHMITT:  Your Honor, I just emailed the Court the screen shot of the upload I did yesterday and the time was 11:01 a.m.  I said the upload

contains Sarah's reports and other docs.

The upload -- I sent it to Mackenzie -- and it shows -- the snippet shows it was uploaded yesterday. You can see this is yesterday.  This is our U.S. Access system (indicating).  One folder had the exhibits in it. This is discovery report from Sarah and it was yesterday and then I sent an email and I also sent this to the Court.

This is the email I sent to Ms. Dyer yesterday.  It just said -- I sent the folder at 11:01. It has Sarah's reports and it continues.  I did send the documents yesterday at 11 a.m.

I understand there may have been a technical issue but I want the record to be clear that I did send the documents.

Honestly, I would object to a continuance.  I sent them at 11 a.m. yesterday.  I had my act together, more than I often do for detention hearings.  I had all the exhibits and all the relevant documents and they were sent yesterday morning.

THE COURT:  Is there any dispute that the documents were sent?

MS. DYER:  I can say on our end we checked with our tech person and this is what I received (indicating), which is one folder, not the zip, and that

45

she says that she downloaded everything that was on U.S. Access.

I'm not saying Nicole did not send this by any means but we did not get it.  I would need time to download and review this and also review it with my client what she provided.

MS. VASQUEZ SCHMITT:  I would say obviously they want to read them but the reports are very -- I sent a subpoena to XYZ.  She has the Statement of Facts, the search warrant affidavits and the Statement of Facts which literally contain everything in the report.

THE COURT:  I'm curious as to why you were asking about the 302s if you didn't have them?

MS. DYER:  I was just doing a general inquiry to make sure I had everything that Agent Stirrup had produced.  I didn't have any expectation that would be the response that I received but she did indicate in her testimony that she conducted a number of interviews and those were relevant to her testimony and that's why I am entitled to review them and use them.

THE COURT:  I certainly think you are entitled to review them.  The issue here is they were sent.  I'm not hearing that you are challenging that they were sent by Ms. Vasquez Schmitt or are you?

MS. DYER:  I don't have them so I can't say

for certain if she sent them and they got lost in the Ethernet or the file was too big and somehow not on U.S. Access.

I'm not trying to throw accusations out there but I can't say for certain that it was uploaded in a way that I was able to access them.

THE COURT:  Here's the problem.  I understand just from talking to Ms. Eckenrode that your request is along the lines of a continuance for an hour.  That's not going to work for my schedule.  I understand it may not work for Ms. Vasquez Schmitt's schedule.

We have two options of continuing here this morning or continuing the hearing until such time that we are all available to continue.

Ms. Vasquez Schmitt, as an initial matter, do you have any objection to continuing the hearing to an additional time?

MS. VASQUEZ SCHMITT:  I did lodge an objection.  Certainly, I understand.  I do.

THE COURT:  What we would have to do if we are going to continue the hearing is find another time that everyone, including the agent, is available.  My only concern here because you haven't looked at Ms. Vasquez Schmitt's evidence and it does appear to me it was sent, I can't dispute that and I can't really dispute you

didn't receive it.

MS. LONG:  Your Honor, I'm Elisa Long from the Public Defenders Office.  This is the receipt of our documents that we received yesterday at 11:26 (indicating).  This is the entirety of the documents that we received.

I do want -- these are the exhibits that the government introduced today at the hearing.  This is what we received and what our IT downloaded.

Ms. Dyer diligently reviewed all this for the hearing today.  She was not aware there were additional reports until she responded to the question.

MS. VASQUEZ SCHMITT:  The folder is entitled "Detention Documents."  This folder is entitled "Detention Documents."  Then there is a separate folder called "Discovery Report."

It appears to me your IT person only downloaded the detention documents.  You are looking at the internal file system, not U.S. Access.

MS. LONG:  Our IT person downloaded the thing from U.S. Access.  These are the additional documents under discovery.  It's the screen shots and the affidavit.  They are not the 302s and not the documents contained in the zip file.

We don't have them.  We didn't have them.  It

is not bad faith on our part.  We just don't have them.

We followed the procedures of the Court.  I want the record to reflect that Ms. Dyer had an opportunity to actually read the documents and review them with our client before the proceeding, but Mr. Atwood should not remain in custody unnecessarily long for a --

THE COURT:  If you are requesting a continuance, Mr. Atwood is going to remain in custody until we are able to complete the detention hearing.  I don't think there is any other alternative we have.

If you want to continue today, and I understand that from your standpoint, I totally understand that you want the ability to review everything because there is some issue here about receipt, and I'm happy to give you that opportunity but I can't at the same time release Mr. Atwood pending a further proceeding in this case.  I don't think that would be an appropriate response here.

MS. LONG:  We would ask for a recess until this afternoon.

THE COURT:  The problem with recessing until this afternoon is I'm not sure everyone is available this afternoon.  Are you available?

MS. VASQUEZ SCHMITT:  I have a 11:30 and a two

p.m.

MS. LONG:  How about at three.

THE COURT:  I will have to check my schedule as well.  I have to consult with Ms. Eckenrode on that. I know we have had at least two new arrests today that I have to handle and I have a meeting this afternoon.

MS. VASQUEZ SCHMITT:  I will not be available until four p.m.  I don't know how long the two p.m. is going to go.

THE COURT:  I think starting at four p.m. just from a custodial standpoint and other standpoints might not allow us to get done based on what it looks like the defense intends to present.

I anticipate you have witnesses and you have multiple exhibits that were filed yesterday.  If you are requesting a continuance from today's proceeding, I will grant that but I can't agree that we can commence here today at four p.m.  That is untenable.

It's your option to continue it.  I think in fairness to Mr. Atwood, that is the appropriate thing to do but I'm not going to start a hearing today at four p.m. that I know we will not get done today anyway.

Mr. Atwood has to remain in custody until we reschedule.  We already had a week that the defense requested to schedule this hearing for today, so having

further delay, and I appreciate that he is being held in custody, I'm sympathetic to that, but we already had a longer period of time than we normally provide for a detention hearing so that you could prepare.

If you need more time to prepare, I will grant that motion but it is not going to be today.

MS. LONG:  Does the Court anticipate rescheduling it tomorrow?

THE COURT:  I will look at my schedule and I will get it scheduled as quickly as everyone is available.

MS. VASQUEZ SCHMITT:  Your Honor, I'm unavailable tomorrow.

MS. LONG:  May I have a moment to talk to Ms. Dyer?

THE COURT:  Yes.

(Sidebar discussion was concluded.)

MS. DYER:  Thank you for the time, Your Honor. We are seeking a continuance to review the documents that we're entitled to review and potentially use during this proceeding.

THE COURT:  All right.  As I indicated at sidebar, I am going to grant that request and reschedule for Friday.

MS. DYER:  May I have one moment?

(Pause in the proceedings.)

MS. DYER:  Thank you.

THE COURT:  In checking my schedule, I'm available at 10:30 on Friday to continue the hearing. Is that going to work for the government and the agent?

MS. VASQUEZ SCHMITT:  Yes, Your Honor.

THE COURT:  Ms. Dyer, at 10:30 on Friday, does that work for you?

MS. DYER:  Yes, it does.

THE COURT:  Due to these circumstances, I'm continuing this hearing on the preliminary examination and detention hearing until this Friday at 10:30 a.m.

Anything else?

MS. VASQUEZ SCHMITT:  No, Your Honor.

THE COURT:  Thank you.

(Whereupon, the above hearing recessed at 10:30 a.m. To resume Friday, April 26, 2024, at 10:30 a.m.)

- - -

I hereby certify by my original signature herein, that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.


S/ Karen M. Earley

Karen M. Earley

Certified Realtime Reporter