1

IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA

UNITED STATES OF                    CRIMINAL ACTION
AMERICA,

        vs.                        No. 24-mj-623

JOSHUA LEE ATWOOD,

        Defendant.

═════════════════════════════

        Transcript of CONTINUED DETENTION HEARING
                held on April 26, 2024
   United States District Court, Pittsburgh, Pennsylvania
   BEFORE:  HONORABLE PATRICIA DODGE, DISTRICT MAGISTRATE

APPEARANCES:

For USA:                           Nicole Vasquez Schmitt, Esq.
                                   Assistant U.S. Attorney
                                   U.S. Attorney's Office
                                   700 Grant Street
                                   Pittsburgh, PA 15219

For the Defendant:                 Kathryn Kitt Dyer, Esq.
                                   Federal Public Defender
                                   1001 Liberty Avenue
                                   Pittsburgh, PA 15222-3716

Court Reporter:                    Karen M. Earley, RDR-CRR
                                   Joseph F. Weis, Jr.
                                   U.S. Courthouse
                                   Room 6260
                                   700 Grant Street
                                   Pittsburgh, PA 15219
                                   412-201-2660

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

- - -

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT WITNESS: | | | | |
| Special Agent Stirrup | -- | 9 | 39 | 43 |
| DEFENSE WITNESS: | | | | |
| Jessica Yalenty | 48 | 53 | -- | -- |
| REBUTTAL WITNESS: | | | | |
| Agent Stirrup | 54 | 55 | -- | -- |
| Judge Dodge's Finding | 78 | | | |

3

P R O C E E D I N G S

(April 24, 2024, 10:35 a.m.  In open court.)

THE COURT:  Good morning, everyone.

Please be seated.

All right.  We are going to proceed with the detention hearing, but as I mentioned to counsel before we got started this morning, an indictment was issued yesterday by the District Court for the District of Columbia in connection with this matter.  So we are now proceeding under an indictment rather than under a criminal complaint.

So just for efficiency purposes, I'm going to conduct an initial appearance on the indictment itself and we will proceed immediately thereafter with the resumption of the cross-examination of Agent Stirrup.

Mr. Atwood, the purpose of an initial appearance is to advise you of the nature of the charges against you in the indictment that was issued after a grand jury charged you with various offenses in the District of Columbia.  So I'm going to briefly review I that with you at this time.

According to the indictment, you have been charged with the following matters, all of which occurred or are alleged to have occurred on January the 6 of 2021.

In Count 1, you have been charged with civil disorder. That would be a violation of Title 18 of the United States Code, Section 231(a)(3).

In Count 2, you have been charged with assaulting, resisting, or impeding certain officers using a dangerous weapon. That would be a violation of Title 18 of the United States Code, Sections 111(a)(1) and (b).

In Count 3, you have been charged with assaulting, resisting, or impeding certain officers using a dangerous weapon. That would also be a violation of Title 18, United States Code, Sections 111(a)(1) and (b).

In Count 4, you have been charged with entering and remaining in a restricted building or grounds with a deadly or dangerous weapon. That would be a violation of Title 18, United States Code, Section 1752(a) and (b)(1)(A).

In Count 5 of the indictment, you have been charged with disorderly and disruptive conduct in a restrictive building or grounds with a dangerous or deadly weapon. That would be a violation of Title 18, United States Code, Sections 1752(a)(2) and (b)(1)(A).

In Count 6 of the indictment, you have been charged with engaging in physical violence in a

restrictive building or grounds with a deadly or dangerous weapon.  That would be a violation of Title 18 of the United States Code, Section 1752(a)(4) and (b)(1)(A).

In Count 7, you have been charged with disorderly conduct in a Capitol building in violation of Title 40 of the United States Code, Section 5104(e)(2)(D).

In Count 8 of the indictment, you have been charged with act of physical violence in the Capitol grounds or buildings.  That would be a violation of Title 40 of the United States Code, Section 5104(e)(2)(F).

Finally, in Count 9, you have been charged with parading, demonstrating, or picketing in a Capitol building.  That would be a violation of Title 40 of the United States Code, Section 5104(e)(2)(G).

Mr. Atwood, I want to assure you this isn't the day that you will be asked to respond to the indictment, but as with the criminal complaint, you have the right to remain silent.  I want to remind you that any statement that you might make to a prosecuting attorney or to an investigating agent can be used against you.

You also have the right to consult with

Ms. Dyer about any matters relating to the indictment and I know she has already been appointed to represent you and will continue to represent you in connection with the indictment that was issued yesterday.

Ms. Vasquez Schmitt, I am assuming that the government is making the same request for detention in connection with the indictment that it made in connection with the criminal complaint, is that right?

MS. VASQUEZ SCHMITT:  Yes, that's correct, Your Honor.

THE COURT:  All right.  Unless there is any other matter relating to the initial appearance on the indictment, I believe we are prepared to move forward with continued testimony in the detention hearing.  If there is anything before that, I'm happy to hear from counsel.

MS. VASQUEZ SCHMITT:  Do you want me to go through the maximum penalties?

THE COURT:  Because we are not doing an arraignment today, I don't think we need to do that. Thanks for reminding me of that.  I'm going to also issue the same Brady order that was issued in connection with the original criminal complaint and briefly just remind the United States that it has an obligation to turn over and disclose Brady information to Mr. Atwood

and, again, I'll remind government counsel that failure to comply with its disclosure obligations may result in consequences such as the exclusion of evidence, dismissal of charges, contempt proceedings, disciplinary referral, and any other relief that may be authorized by law.  Just out of an abundance of caution, I will issue that order again.

Ms. Dyer, it looks like you have some matters to address.

MS. DYER:  Yes, Your Honor.  I just wanted to address the conversation that we had at sidebar and on the record in open court on Wednesday with regard to the discovery production related to the preliminary hearing and the detention hearing.

Just to update the Court that we did confer with our technical support in our office and the documents were not shared in our access to the government's U.S. FX folder.

I notified Ms. Vasquez Schmitt.  She uploaded again, but as far as I can tell, I don't know if she has been able to check if it was actually shared with our office, but it was not shared in the folder and we did not have access to it.

We did by the end of the day get a flash drive with the discovery but I did think it was important to

notify the Court that it was not an oversight or not downloaded by the technical support in my office.

THE COURT:  I appreciate that.  I assume that's given you sufficient time to review what you had not seen before?

MS. DYER:  Yes.

THE COURT:  All right.  Ms. Vasquez Schmitt, do you want to add anything?

MS. VASQUEZ SCHMITT:  No, Your Honor.  What I started on the record previously, I did upload the documents in good faith the day before the hearing.

THE COURT:  I understand.  I think we may never know what happened, but I am glad we were able to give some additional time.

Just one other clean-up matter from last time. Ms. Dyer, I do want you to know that we did our best to get your monitor working and we had folks in here yesterday and today but apparently, the issue is bigger than can be handled -- is going to take a longer term fix.

So, again, if there is any time there is something displayed on the monitor and you need to move or go to some other location to look at it, you are most welcome to do that.

MS. DYER:  Thank you, Your Honor.

THE COURT:  Then I think we are ready to resume cross-examination.

Agent, will you resume the stand, please.

Just as a reminder, you are still under oath.

CROSS-EXAMINATION (Cont.)

BY MS. DYER:

Q.   Good morning, Agent Stirrup.

A.   Good morning.

Q.   Between Wednesday and today, have you spoken with anybody about your testimony?

A.   No, ma'am.

Q.   Have you spoken with anybody about this case?

A.   Yes, ma'am.

Q.   Who have you spoken with?

A.   My supervisor.

Q.   What did you discuss with your supervisor?

A.   Just how my day in court went and told him that we were postponing until today.

Q.   You discussed the testimony that you gave to your supervisor?

A.    I just told him that I started the cross-examination with one question, then we moved to finish Friday because of the discovery.

Q.   And did you talk about the substance of your testimony?

A.   No, ma'am.

Q.   Did you talk about the substance of this case?

A.   No, ma'am.

Q.   Agent, how many January 6 cases have you worked on?

A.   Just this one.

Q.   I think you testified on direct you joined the FBI in June of 2023?

A.   Yes, ma'am, as a new agent.

Q.   This case was assigned to you in January of 2024?

A.   Yes, ma'am.

Q.   That was the first time you became aware of AFO 299?

A.   This is the first time I became aware of Mr. Atwood, yes, ma'am.

Q.   Was he designated with the BOLO No. 299?

A.   No, ma'am.  He was designated with the AFO No. 229, I believe.

Q.   So in your complaint, that was a sworn affidavit, yes?

A.   Yes, ma'am.

Q.   And in that complaint you identified Mr. Atwood as AFO 299?

A.   Yes, ma'am.

Q.   Is that correct?

A.   Yes, ma'am.

Q.   So that was a mistake?

A.   Yes, ma'am.

Q.   So the FBI was aware you said it BOLO 229?

A.   Yes, ma'am.

Q.   The FBI and agents within the agency were aware of AFO 229 since 2021?

A.   Yes, I believe so, yes, ma'am.

Q.   You were given information about what other FBI agents had done with AFO 229 when you were assigned to the case?

A.   Yes.

Q.   And the FBI had been collecting information prior to when you were assigned to the case?

A.   Yes, ma'am.

Q.   Prior to when you started working at the FBI?

A.   Yes, ma'am.

Q.   The FBI has about 35,000 employees?

A.   Yes, ma'am.

Q.   And over 10,000 special agents?

A.   I believe so.

Q.   There was a task force that was specifically working on January 6, 2021 cases?

A.   I don't know.

Q.   The FBI generally was asking the public to assist in identification of individuals?

A.   Yes, I believe so.

Q.   So that BOLO AFO number is an assigned number to people who haven't been identified yet by name?

A.   Yes, I believe so.

Q.   So each number corresponds with one specific person?

A.   I believe so.

Q.   So the individual that is identified as AFO 299 is what you listed in the complaint, correct?

A.   Yes, ma'am.

Q.   And that was actually a man by the name of Dale Huddle, correct?

A.   I don't know.

Q.   It was somebody else?

A.   Is that a question?

Q.   Yes.

A.   Yes, ma'am.

Q.   So just to be clear, the FBI identified him as 229 --

          MS. VASQUEZ SCHMITT:   Your Honor, asked and answered.  Objection.

          THE COURT:   That objection is sustained.

Q.   In your reports do you refer to AFO 229 or 299?

A.   The reports that I authored?

Q.   Yes.

**Agent Stirrup - Cross**

A.   Can you refresh my memory as to which report you are speaking of, please.

Q.   Well, I would start with the -- I'll move on.

When you got the case, the FBI had publicly identified AFO 229 as Joshua Atwood?

A.   Yes, ma'am.

Q.   So that was in January of 2024?

A.   No, ma'am.  I believe he was identified prior to me receiving the case as the case agent.

Q.   When was he identified to the FBI as Joshua Atwood?

A.   I would need to refer to the case file to refresh my memory of the date.

Q.   You may do that.

A.   I don't have the document that you are referring to.

Q.   So you don't know when --

A.   I don't remember the date.

Q.   Do you remember what year it was?

A.   I don't remember.  I'm sorry.  I'm nervous.  I don't remember.  If you don't mind refreshing my memory.

THE COURT:  Agent, you can only testify about what you recall.  If you can't recall something, you can let Ms. Dyer know and she'll ask you another question.

THE WITNESS:  Thank you, Your Honor.

A.   I don't recall.

**Agent Stirrup - Cross**

Q.   Suffice it to say, the FBI was aware that AFO 229 was suspected to be Joshua Atwood in 2023?

A.   I don't recall.

Q.   It was prior to you getting the case?

A.   Yes, ma'am.

Q.   So the process by which the FBI tries to identify individuals utilized public bulletins, correct?

A.   I believe the FBI used various techniques to identify individuals present.

Q.   Could you talk about what those techniques are.

A.   Open source video, facial recognition technology.

Q.   So the FBI puts a call out to the public to assist in identifying individuals?

A.   I don't know the process, ma'am.  I wasn't a part of the identification process for Mr. Atwood.

Q.   So you don't know how Mr. Atwood was identified?

          MS. VASQUEZ SCHMITT:  Your Honor, I'm going to lodge an objection to the extent this relates to either identity or to the probable cause.  I don't know how long Ms. Dyer has plans to be on this topic but he has now been indicted and they didn't challenge his identity.

          So I would just object to the extent that these questions are beyond the scope of the detention hearing.

THE COURT:  Are you challenging identity?

MS. DYER:  We waived our right to an identity hearing and that is because the identity hearing has to do with whether or not Mr. Atwood is the person named in the documents.  We have not conceded identity in this case.

MS. VASQUEZ SCHMITT:  Your Honor, I think that relates more to probable cause.  He has been indicted as Joshua Lee Atwood for the conduct.  It's him in the picture.  The grand jury indicted him of that conduct.  They didn't challenge that he is Joshua Lee Atwood as named in the compliant and now the indictment.

I think these questions don't relate to the Bail Reform Act factors and so I would object.

THE COURT:  All right.  Let's move on to matters that relate to the factors that I'm required to consider in a detention hearing.

MS. DYER:  Judge, I am going to ask her the way that she obtained the tip and what information she has about it which I do believe goes to the weight of the evidence.

THE COURT:  Well, let's ask her that and then move on.

Agent, perhaps if you can move that microphone a little closer to you.  I want to make sure we can all

hear you.  Thank you.

Q.   You testified yesterday that the FBI received a tip from an individual using facial recognition?

A.   On Wednesday, yes, ma'am.

Q.   Wednesday, yes.

What date -- you don't know the date that tip came in?

A.   I cannot recall, ma'am.

Q.   What was provided in the tip?

A.   I do not recall, ma'am.  I read the reports of the case file.  I do not recall the substance about being able to review it.

Q.   So you don't know what means the FBI received the tip?

MS. VASQUEZ SCHMITT:  Your Honor, objection asked and answered.  She has all of the 302s.  It would be very simple to just hand her the relevant 302s.  She can't be expected to remember every single date from all of the 302s.

THE COURT:  The objection as to asked and answer is sustained.

Q.   Do you recall what identifying information the FBI obtained from the tip provider?

A.   Yes, ma'am.  I believe it was related to a facial scar on the individual's forehead.

Q.    And the tip -- did you obtain a name of the person that gave the tip?

A.    No, ma'am.  I don't recall, no, ma'am.

Q.    Did agents seek the basis of knowledge that this person had?

A.    Well, all of the FBI tips are validated through our own investigations.

Q.    We're going to get to that but I want to know what information you got from the tip provider in the first place?

A.    I do not recall, ma'am.  I wasn't the person who received it.

Q.    You testified yesterday that it was done through facial recognition?

A.    Yes, ma'am.  That's how we validated the tip that was provided, yes, ma'am.

Q.    You validated the tip?

A.    The FBI.

Q.    So what documents, data, or information was given to you to be validated?

A.    The information already provided in the case file when I received it as the agent.

Q.    And what information linked you to look at the facial recognition?

        MS. VASQUEZ SCHMITT:  Your Honor, objection.

Asked and answered.  She said they gave his name Joshua Lee Atwood and there was a facial scar.  So objection, asked and answers.

MS. DYER:  This line of questioning goes to what she testified yesterday about the fact that facial recognition software was used to provide the tip.

So I think it's a valid line of questioning to ask questions about what was inserted into the facial recognition software and what software was used.

THE COURT:  I don't think that that is relevant here.  So let's move on.

Q.   Agent, was there any other information you received from the tip provider?

A.   I do not recall, ma'am.

Q.   You testified yesterday that the facial recognition was completed through publicly available photos?  Sorry, Wednesday.

A.   Can you please repeat the question.

Q.   Sure.  You testified on Wednesday that the facial recognition was completed with publicly available photos, correct?

A.   Yes, ma'am.  I testified there was different buckets of information that the FBI has of validating identities of the individuals present.  So public open source information I testified to, the body worn camera

footage and also Capitol closed circuit video footage, as well.

Q.   I understand that is the evidence in this case. I'm asking about what was your comparison point.

A.   I guess I don't understand your question.

Q.   You testified that you received information that the people and the evidence provided on Wednesday, a tip linked it to Joshua Atwood.  I'm asking what document, piece of evidence, photograph, what did you use to try to link it together in your verification?

MS. VASQUEZ SCHMITT:  Your Honor, objection as to mischaracterizing her testimony.  I don't know that she testified that she did the facial recognition.

Also, I would continue my objection that this really relates more to probable cause which has been established by the indictment than to the Bail Reform Act factors.

THE COURT:  Agent, did you have anything to do with the linking of the facial recognition?

THE WITNESS:  No, ma'am.

THE COURT:  Then let's move on from there.

Q.   Did you take any steps to assure the accuracy of the information used to link previous documentation to Mr. Atwood?

A.   Yes, ma'am.

Q.   And what did you do?

A.   I reviewed the footage that we had that I mentioned previously.  So open source video footage, body worn camera video footage, closed circuit video footage from the Capitol and compared it to photos of Mr. Atwood.

Q.   You compared it to photos of Mr. Atwood?

A.   Yes, ma'am.

Q.   What photos?

A.   Specifically his driver's license photo that is available for the State of Pennsylvania.

Q.   The tip came from a 2011 arrest, is that right?

A.   Yes, ma'am, I believe so.

Q.   And you testified yesterday that you confirmed that information with a police officer, correct?

A.   Can you specify what information, ma'am?

Q.   You did a third-party identification?

A.   Yes, ma'am.

Q.   As a new FBI agent, you have been trained on how to conduct identification?

A.   Yes, ma'am.

Q.   You're out and you make an arrest, you can do a lineup?

A.   Yes, ma'am.

Q.   And that's where you put similar looking people together to see if a witness can identify a suspect?

A.   Yes, ma'am.

Q.   You can do a photo array?

A.   Yes, ma'am.

Q.   And that's where you show a group of similar looking people to see if a witness can pick out an individual from the group?

A.   Yes, ma'am.

Q.   So, in general, law enforcement officers don't just show one photo to a witness?

A.   No, ma'am.

Q.   Because it would be very suggestive?

A.   Yes, ma'am, sure.

Q.   So, in this case, you conducted a photo identification with Officer Don Blankenship?

A.   Yes, ma'am.

Q.   And he works in New Cumberland, West Virginia?

A.   Yes, ma'am.

Q.   So not in Pennsylvania?

A.   I don't know where else he works.  It's a part-time police department.

Q.   You didn't meet with Officer Blankenship in person?

A.   No, ma'am.

Q.   You asked Officer Blankenship if he knew Joshua Atwood?

A.   Yes, ma'am.

Q.   And you testified on direct that he had arrested Mr. Atwood in May of 2023?

A.   Yes, ma'am.

Q.   But actually it was the U.S. Marshals who conducted the arrest, correct?

A.   Yes, ma'am.  He told me that he was there.

Q.   And he told you he was in his patrol car near the road while the marshals conducted the arrest?

A.   No, ma'am.

Q.   U.S. Marshal Chad Simpson is the one who conducted the arrest of Mr. Atwood in May of 2023?

A.   Yes, he was one of the arresting officers, I believe.

Q.   According to U.S. Marshal Simpson, there were no issues with Mr. Atwood's arrest?

A.   No, ma'am.  They said they went into the house and he was in the back room and that was it.

Q.   He was arrested without issue?

A.   Yes, ma'am.

Q.   So when you spoke with Officer Blankenship, you didn't provide a photo array of different people to see if he could identify Joshua Atwood?

A.   I sent him photos of who we had identified as Mr. Atwood at the Capitol and asked him whether or not he would be able to identify if that looked like

Mr. Atwood to him.  So I sent just the photos, those photos.

Q.   So you weren't in person?

A.   No, ma'am.

Q.   You sent it over email?

A.   Yes, ma'am.

Q.   And you sent it over email after you talked to Officer Blankenship about your suspicions about Joshua Atwood --

A.   I believe so.

Q.   And in the email you sent an attachment with photos from January 6 of 2021, still shots, correct?

A.   Yes, ma'am.

Q.   And in that document, you also sent the driver's license photo of Joshua Atwood?

A.   Yes, ma'am.

Q.   You labeled it Joshua Atwood?

A.   Yes.

Q.   You included Joshua Atwood's date of birth in that document?

A.   Yes, ma'am.

Q.   That driver's license photo, that didn't have anything to do with January 6, 2021, correct?

A.   No, ma'am.

Q.   You didn't ask Officer Blankenship to identify

Joshua Atwood's voice, did you?

A.    No, ma'am.

Q.    You didn't have anybody identify Joshua Atwood's voice, correct?

MS. VASQUEZ SCHMITT:  Your Honor, I just want to object again.  We put on some more testimony than we might have because we were in a unique situation, but we now have an indictment.

I think a lot -- I'm trying not to object to every question.  I understand the weight of the evidence is a factor.  So I'm certainly not going to that but I think it's been a lot of the same questions that more go toward probable cause.  So I would object.

THE COURT:  Ms. Dyer.

MS. DYER:  Your Honor, what evidence is going to be admissible at trial is something that goes to the weight of the evidence and so I think getting into the investigation and how evidence has been obtained and whether or not that evidence is reliable or suggestive is a valid line of cross-examination given the testimony on Wednesday.

THE COURT:  Well, certainly the fact that the grand jury has returned an indictment that suggests that the grand jury found there was probable cause to indict Mr. Atwood.  Of course, he retains the presumption of

innocence at this time.

I think the detail with which we are going through the agent's investigation is getting far afield of the weight of the evidence.

I understand you can argue that, you can certainly look at that, but I would suggest that you minimize questions about Officer Blankenship.  I think I understand what you're trying to establish there and I would suggest that you begin to move on to another topic.  You do have the right to challenge the weight of the evidence.

MS. DYER:  I can move on.

THE COURT:  Okay.  Good.

Q.   Agent, you were present during Mr. Atwood's arrest last week?

A.   Yes, ma'am.

Q.   You participated in the search of his house?

A.   No, ma'am.

Q.   You watched the search happen?

A.   No, ma'am.  I was transporting Mr. Atwood to Pittsburgh, so I was not there for the search.

Q.   You testified on direct that you saw guns in his home?

A.   I saw photos of guns in his home.

Q.   And those guns were locked in a safe?

A.   I saw photos of the guns in the safe.

Q.   That was in the parents' bedroom?

A.   I saw the safe in the house from the photos.

Q.   You did go into the house?

A.   I did not step foot into the house.

Q.   So you testified on Wednesday that you saw marijuana in the house.  That was a photograph?

A.   Yes, ma'am.

Q.   And nobody tested the substance that you said was marijuana?

A.   No, ma'am.

Q.   Did you see any photographs of Mr. Atwood's medical marijuana card in the house?

A.   Yes, ma'am.

Q.   Did you see any photos of children's gates in the house?

A.   I do not recall.

Q.   You looked into your investigation what licenses Mr. Atwood had?

A.   Yes, ma'am.

Q.   He had a conceal and carry permit?

A.   I believe it was a license to carry permit.

Q.   He is EPA certified as a 608 clean air HVAC technician?

A.   I do not know.

**Agent Stirrup - Cross**

Q.   In your investigation, you identified two houses in Burgettstown that Mr. Atwood was affiliated with, correct?

A.   Yes, ma'am.

Q.   One on the Main Street Extension that was gutted?

A.   Yes, ma'am.

Q.   And one on Route 18 where Mr. Atwood was arrested?

A.   Yes, ma'am.

Q.   He was arrested at the same house on Route 18 in May of 2023, correct?

A.   Yes, ma'am.

Q.   Both addresses were located in Burgettstown?

A.   Yes, ma'am.

Q.   And you may not know this, buy is it fair to say Burgettstown is a small town?

A.   I do not know.

Q.   Fewer than 1,500 people live there?

A.   I do not know.

Q.   Mr. Atwood lived on Route 18, correct?

A.   Yes, ma'am.

Q.   In fact, you spoke with neighbors to confirm that Mr. Atwood lived at that location?

A.   No, ma'am, I did not speak to any neighbors.

Q.   Agents from your agency?

A.   No, ma'am, no agents from FBI spoke to any

neighbors.

Q.   How about from the U.S. Marshal office?

A.   I spoke with Chad Simpson who said he spoke with neighbors in the past.

Q.   Any information about speaking with neighbors in 2024?

A.   I don't know if he spoke with them in April.  I don't know when he spoke to them.  I do not recall.

Q.   How about at the end of March?

A.   Possibly.  I'm not sure, ma'am.  I don't recall.

Q.   You testified on direct that some of the videos you reviewed and were put into evidence are open source videos?

A.   Yes, ma'am.

Q.   And can you explain again for the Court what -- how did you define open source?

A.   For open source is available to the public.  It's not law enforcement only information or private information.  It's something posted to the open source Internet.

Q.   So it could be posted by members of the public?

A.   Yes, ma'am.

Q.   Some of the government's video exhibits were categorized as open source video?

A.   Yes, ma'am.

Q.   And that means the FBI downloaded these videos from the Internet?

A.   Yes, ma'am.

Q.   What steps did you or other agents take to ascertain the owner of the videos?

A.   These videos were identified before I was on the case.  So I don't recall the steps that were taken, as you put it.

Q.   To figure out who made them?

A.   Yes, ma'am.

Q.   Is there information in your file about who made each video?

A.   No, ma'am, I don't believe so in anything that I authored.

Q.   What steps, if any, have you heard from agents or you, yourself, have done to verify that the video hadn't been edited?

A.   I don't know, ma'am.

Q.   You, yourself, didn't take any steps to ascertain whether or not the video had been edited?

A.   No, ma'am.

Q.   As an analyst who works in this field, you understand videos can be edited, yes?

A.   I understand videos can be edited.

Q.   With artificial intelligence rapidly improving how

people appear on video can be edited?

A.    I understand.

Q.    Is that a yes?

A.    Yes, I understand what you're -- are you asking a question?

Q.    Yes.

A.    I understand your question.

Q.    Objects could be added to a video?

A.    Yes.

Q.    Or taken away from a video?

A.    Yes, ma'am.

Q.    You talked on Wednesday -- you testified on Wednesday about Mr. Atwood's May 2023 arrest related to a West Virginia case?

A.    Yes, ma'am.

Q.    And you said you spoke with the Chester Police Chief?

A.    Yes, ma'am.

Q.    His name is --

A.    I do not recall.  I believe it's Chuck Stanley.

Q.    Chief Stanley indicated to you that through his investigation, he was given a phone number that he thought belonged to Joshua Atwood?

A.    Yes, ma'am.

Q.    That phone number came from the complaining witness

in the case?

A.   Yes, ma'am.

Q.   And Chief Stanley indicated that they had called the number and left a message?

A.   Yes, ma'am.

Q.   But they had never actually connected and spoken with Mr. Atwood or anyone else?

A.   I believe so, yes, ma'am.

Q.   Chief Stanley believed that Mr. Atwood lived in Burgettstown, Pennsylvania?

A.   Yes.  They ran his name and got his driver's license and they believed he lived at 58 Main Street in Burgettstown.

Q.   Ultimately, he was arrested in Burgettstown by the marshals?

A.   Yes, ma'am.

Q.   In your investigation into that West Virginia matter, there is no indication that Mr. Atwood had missed any court dates?

A.   No, ma'am.

Q.   There's no indication that he had been arrested subsequent to May 2023 until this case?

A.   Yes, ma'am.

Q.   The information that you got from Chief Stanley he got from talking to other people, correct?

**Agent Stirrup - Cross**

A.    Can you specify what information you are referring to?

Q.    You testified on Wednesday about some of the details of the allegations in that case?

A.    Yes, ma'am.  He was not present for the initial scene investigation responding to the incident that occurred in April.

Q.    But according to the information he gave you, it was law enforcement's understanding that this was a dispute over money?

A.    Yes.

Q.    And that the complaining witness and Joshua Atwood got into a physical fight?

A.    Yes, ma'am.

Q.    And that the complaining witness said he physically tried to stop Mr. Atwood from leaving?

A.    Yes, ma'am.

Q.    You testified on direct that there was potentially a concealed firearm on the scene?

A.    Yes.

Q.    There was never any allegation that Mr. Atwood used any firearm in the encounter?

A.    No, ma'am.

Q.    There was never an allegation that Mr. Atwood threatened to use a firearm?

A.    No, ma'am.

Q.    You testified about a conversation you had with the McDonald Borough Police Department regarding a 2011 arrest?

A.    Yes.

Q.    That would have been when Mr. Atwood was 18 years old?

A.    Yes, ma'am, I believe so.

Q.    Approximately 12 to 13 years ago?

A.    Yes, ma'am.

Q.    And you didn't have the physical report in this case?

A.    No, ma'am.  It was being sent over.  I have not reviewed it since.  I didn't want it to alter any testimony that I gave so I haven't looked at it.

Q.    On Wednesday you testified you were not aware of that arrest until you saw it in the Pretrial Services Bond Report?

A.    Yes, ma'am.

Q.    You hadn't made any efforts prior to that to get that file?

A.    No, ma'am.

Q.    You never obtained the mugshot from that arrest?

A.    I don't believe so.

Q.    Do you have the mugshot?

A.   No, ma'am.  Like I said, I haven't reviewed the report.

Q.   So even though that was the mugshot that was supposedly used to identify Mr. Atwood as a suspect in this case, you never got that mugshot?

A.   No, ma'am.  There was a mugshot provided but I believe it was from the 2011 incident in Franklin.

Q.   That's what I'm talking about.

A.   Franklin is in Indiana.  This is in Pennsylvania.

Q.   Did you obtain that record?

A.   Yes, ma'am.  I received it on the NCIC report that we pulled on his criminal history.

Q.   When did you pull that?

A.   I don't recall the date, ma'am.

Q.   So what steps did you take to verify the mugshot that was used to identify him?

A.   Identify him how?  Can you please specify?

Q.   Identify him as a suspect in this case.  How did you verify that mugshot was the correct mugshot?

A.   It was uploaded in his case file and it corresponded to the NCIC report.  I'm sorry.  I don't understand what you're asking.

Q.   I'm asking if you obtained the mugshot anywhere other than from the tipster?

A.   When I pulled his NCIC report, I saw his criminal

history.

Q.    Did you do a comparison of the pictures?

        MS. VASQUEZ SCHMITT:  I'm sorry.  Objection as to -- I don't even know if it's clear what mugshot.  The Franklin mugshot, compare the mugshot to the mugshot?

        THE COURT:  Ms. Dyer, if you clarify.  We have been both talking about the 2011 matter and the Indiana matter which I think was in 2010.

        So if you can clarify for the agent what mugshot you are referencing, that would be helpful to clarify things.

Q.    I'm asking which mugshot was used through facial identification to identify Mr. Atwood?

A.    I do not recall.  I need to refer to the case file, ma'am.

Q.    Agent Stirrup, you testified about a disorderly conduct case from 2021?

A.    Yes.

Q.    And that case involved a car accident?

A.    Yes, ma'am.

Q.    There were three cars involved?

A.    Yes, ma'am.

Q.    It was a snowy night?

A.    Yes, ma'am.

Q.    There was talk in that report about the fact that

it was snowy on the streets?

A.   Ma'am, I didn't have sufficient time to review the report prior to testifying and I have not reviewed it since.

Q.   You testified that a police officer suspected there was marijuana in the car?

A.   Yes, ma'am.  I spoke with the arresting officer -- I'm sorry -- the responding officer, I should say.

Q.   That Mr. Atwood told police officers that it wasn't his truck that he was driving?

A.   Yes, ma'am.

Q.   And, in fact, the truck belonged to his fiancée's father?

A.   I do not know that.  That wasn't told to me.

Q.   If I could have just a moment.

            (Pause in the proceedings.)

            MS. DYER:  Judge, do I have permission to approach the witness with a document?

            THE COURT:  Yes, that's fine.

            MS. VASQUEZ SCHMITT:  May I ask what's being shown to the witness?

            THE COURT:  Please show it first to government counsel.

            (Pause in the proceedings.)

Q.   Do you mind just taking a look at the report that you provided to Ms. Vasquez Schmitt and reviewed to refresh your recollection as to whether or not the truck was confirmed to be Mr. Atwood's fiancée's father?

A.   Yes, ma'am.  I'll read it.

          (Pause in the proceedings.)

          THE COURT:  While you are doing that, which report is that you are showing to the witness so I know?

          MS. DYER:  Sure.  It's the 2021 police incident report that was provided by Ms. Vasquez Schmitt.

          THE COURT:  Thank you.

          (Pause in the proceedings.)

A.   Okay.

Q.   Do you need to scroll down?

A.   Yes.  I guess you were asking about his fiancée.  I didn't see that in here.  I can scroll.

Q.   Well, is it his father-in-law?

A.   All I saw in the report is that he kept saying that the vehicle is not his.  I didn't see that part.

          MS. DYER:  I'm just providing her with another section of the report.  I believe it's the third paragraph.

          (Pause in the proceedings.)

          MS. VASQUEZ SCHMITT:  Third paragraph down on

what page?

THE WITNESS:  Looks like Page 6.

(Pause in the proceedings.)

A.   The third paragraph doesn't say that.  This is the third paragraph (indicating).

Q.   My apologies.  Fourth paragraph -- actually, fourth full paragraph.

(Pause in the proceedings.)

A.   Yes, ma'am, I finished.

Q.   Does that refresh your recollection as to what you saw in the report?

A.   Ma'am, as I stated before, I didn't have a chance to read the report.  That was my first time reading the report.  I had spoken to the officer on the phone who told me about the incident.

Q.   Does reading that report confirm that officers looked into whether that was Mr. Atwood's truck?

A.   Yes.

Q.   And that the truck belonged to Timothy Toomey?

A.   Yes, ma'am.

Q.   And that Timothy Toomey said he had a medical marijuana card?

A.   Yes, ma'am.

Q.   And just to clarify, Mr. Atwood was not arrested that night, correct?

A.   No, ma'am, I don't believe so.

Q.   Agent, you, yourself, transported Mr. Atwood from Burgettstown to the FBI office here in Pittsburgh?

A.   Yes, ma'am.

Q.   That's a 30-minute drive?

A.   I guess without traffic, yes, ma'am.

Q.   It took longer?

A.   Yes, ma'am.

Q.   During that time, Mr. Atwood was cooperative with you?

A.   Yes, ma'am.

Q.   And he was polite?

A.   Yes, ma'am.

MS. DYER:  I have no further questions.

THE COURT:  Thank you, Ms. Dyer.

Ms. Vasquez Schmitt.

MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. VASQUEZ SCHMITT:

Q.   Agent Stirrup, you were asked some questions about the statement of facts about the AFO 299, do you recall that?

A.   Yes, ma'am.

Q.   Was that just a simple typo that no one caught in the statement of facts?

**Agent Stirrup - Redirect**

A.    Yes, ma'am.

Q.    Did that in any way affect the substance of the probable cause allegations in the statement of facts?

A.    No, ma'am.

Q.    Who is in the pictures and whose conduct is described in the statement of facts?

A.    Joshua Lee Atwood.

Q.    So it wasn't this other person, David Huddle's conduct that was described, was it?

A.    No, ma'am.

Q.    You were asked some questions about photo arrays, do you recall that?

A.    Yes, ma'am.

Q.    In your training at the FBI, would it be common to use a lineup, for example, when the person you are showing the photo doesn't know the target or the suspect?

A.    Yes, ma'am.

Q.    But where the person you're asking to identify where they already know that person, would it make sense to proceed as you did just, is this Sarah Stirrup in this photo, for example?

A.    Yes, ma'am.

Q.    You were asked some questions about the phone number related to the West Virginia incident.  Do you

recall that?

A.   Yes, ma'am.

Q.   Do you know was Ms. Toomey, was Brittany Toomey interviewed by the FBI the day of the search?

A.   Yes, ma'am.

Q.   Did you review a report drafted by another agent of the interview of Ms. Toomey?

A.   Yes, ma'am.

Q.   Do you recall did she saying about the phone number that was used in the West Virginia incident?

A.   I don't recall exactly what was said.

MS. VASQUEZ SCHMITT:  Your Honor, may I pass her the report to refresh her recollection that she just testified that she reviewed?

THE COURT:  You may.

Ms. Dyer, do you have a copy of that report?

MS. DYER:  I don't know what she is referring to.

(Whereupon, U.S. attorney hands report to Ms. Dyer.)

Q.   Can you read the fourth paragraph down on Page 2, please.

A.   Toomey was asked if she recalled telephone number 317-519-1030.  Atwood briefly used the phone number at the beginning of their relationship.  Atwood received a

bunch of calls from people so he got rid of the telephone number.

Q.   Does that refresh your recollection about what you read about what Ms. Toomey said the day of the search?

A.   Yes, ma'am.

Q.   So she told the FBI that he did use that number but he had to get rid of it because he was getting a lot of calls?

          MS. DYER:  Objection to the characterization.

A.   Yes, ma'am.

          THE COURT:  Overruled.

Q.   You were asked some questions about the marijuana in the car involved in the 2021 incident.  Do you remember that?

A.   Yes, ma'am.

Q.   I think you also -- Mr. Atwood, he has a medical marijuana card, too, right?

A.   Yes, ma'am.

Q.   What did he tell officers in 2021 about the smell of marijuana?

A.   He does not know what marijuana smells like.

          MS. VASQUEZ SCHMITT:  No more questions, Your Honor.

          THE COURT:  Any further cross?

MS. DYER:  Yes, just one.

RECROSS-EXAMINATION

BY MS. DYER:

Q.   Did you confirm when Mr. Atwood obtained his medical marijuana card?

A.   From the photo, I believe I remember the card being issued for one year.

Q.   It's currently active?

A.   So it's currently active, yes, ma'am.

MS. DYER:  Thank you.

THE COURT:  Ms. Vasquez Schmitt, anything further?

MS. VASQUEZ SCHMITT:  No, Your Honor.

THE COURT:  Before you step down, I want to clarify and make sure I understood something about your testimony.

I believe you testified about the charges that were issued in February of 2021?

THE WITNESS:  Yes, ma'am.

THE COURT:  Are those related to the auto accident that you testified about or just something else, if you know?

THE WITNESS:  I believe the auto accident, yes.

THE COURT:  Thank you.  You can step down.

Thank you, Agent.

Ms. Vasquez Schmitt, is there any other evidence that you intend to produce here today?

MS. VASQUEZ SCHMITT:  No, Your Honor.

THE COURT:  Ms. Dyer, I'll turn to you.  Is there any testimony or evidence you are intending to proceed with today?

MS. DYER:  Yes, Your Honor.  As you know, we filed a written brief so all of those exhibits we would ask the Court to rely upon.

I am calling one witness, Jessica Yalenty who is an investigator at the Federal Public Defenders Office.

THE COURT:  Before we do that, I do have in front of me your brief which does include certain exhibits, I think Exhibits A through K.  Are you seeking their admission?

MS. DYER:  I am seeking their admission.  I would like to, for the record, just put briefly on what it is that we are moving to submit.

THE COURT:  That's fine so that I can make sure they are in the record subject to any objections that the government might have.  This is probably a good time to do that.

MS. DYER:  The defense seeks to admit Exhibit

A, which is a letter from David Calderon, who is a business mentor and mentor to Mr. Atwood in his life. He is very well aware of some of the personal hardships that Mr. Atwood has endured, both over the last couple of years and throughout his life.

It is a character letter that can speak to his work ethic and the fact he is presently working. I do admit to move Exhibit A.

THE COURT: Is there any objection to Exhibit A, Ms. Vasquez Schmitt?

MS. VASQUEZ SCHMITT: No. I don't have any objection to any of these exhibits.

THE COURT: All right. Let's just identify what they are. I have reviewed them and I certainly will review them again before we are concluded here today.

MS. DYER: Thank you.

Exhibit B is a letter from Rebecca Klein who is a client of Mr. Atwood in his HVAC business Atwood Home Services, LLC, and speaks to his work for her.

Exhibit C is a photograph of Mr. Atwood with his fiancée, with his children and the top corner, with his mom and grandmother who raised him. Move to admit Exhibit C.

Exhibit D is a letter from the St. Clair

Medical Group who is the medical provider for Ms. Brittany Toomey.  Ms. Toomey is Mr. Atwood's fiancée.  She is scheduled for a C-section on June 10 of 2024.  This is a letter confirming that.

Exhibit E is a letter from Mr. Atwood's fiancée Brittany Toomey.  She has been approved by probation to act as a third-party custodian.  She is a suitable third-party custodian.  Her letter speaks to her relationship with Mr. Atwood, their children and their business.

Exhibit F is the validation sheet and proof of fulfilling the requirement for Mr. Atwood's business Atwood Home Services, LLC, which also has a d/b/a of Keeping You Comfortable.  It has a government TIN number.  Further pages in Exhibit F include certificates of Mr. Atwood's liability insurance for his business.

Exhibit G is a letter from Ronald Miles who is a next-door neighbor of Mr. Atwood, a character letter.

Exhibit H is an obituary for his mother Angie Atwood who passed away on December of 2018.

Exhibit I is two documents from Cowtastic Frozen Yogurt, the business that Rebecca Klein owns.  I wanted to highlight, Your Honor, that there was a closure notice for this past Monday because Mr. Atwood was scheduled to install new frozen yogurt machines.  So

the business was closed and still waiting on that installation.

Exhibit J is a current bid that Atwood Home Services has put in for HVAC services for a business.

Exhibit K is a letter from Mr. Atwood's attorney in West Virginia.  It speaks to the status of the case, what the plan is for moving forward with the defense of the charges should it go to trial and confirms Mr. Atwood's appearance at all court dates and all meetings and communication with his attorneys.

THE COURT:  All right.  I understand there is no objection to their admission.  So Exhibits A through K are admitted.

You can now proceed to call your witness, if you are ready.

MS. DYER:  Thank you.  I call Jessica Yalenty to the stand.

THE COURT:  Please step forward to be sworn.

THE DEPUTY CLERK:  Good morning.  Please raise your right hand.

JESSICA YALENTY, a witness herein, having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please take the witness stand and please state and spell your name for the court reporter.

**Jessica Yalenty - Direct**

THE WITNESS:  Sure.  It's Jessica, J-e-s-s-i-c-a, Y-a-l-e-n-t-y.

DIRECT EXAMINATION

BY MS. DYER:

Q.   Ms. Yalenty, where are you employed?

A.   The Federal Public Defenders Office in Pittsburgh.

Q.   How long have you been employed as an investigator for the Federal Public Defenders Office in Pittsburgh?

A.   Only a few months.

Q.   When did you start?

A.   Mid January.

Q.   How long have you been working within the Federal Public Defenders system?

A.   Almost ten years.  It will be ten years in June.

Q.   What role and what capacity is your work?

A.   I have been an investigator in the Columbus, Ohio office.  I was there for six years and then I transferred to the Washington, D.C. office for three and a half and now I'm here.

I handle everything between serving subpoenas, witness interviews, being a liaison between clients and family members and going to scenes and records requests, all those good things.

Q.   Did there come a time where you were asked to work on Joshua Atwood's case?

**Jessica Yalenty - Direct**

A.    Yes.

Q.    When did that happen?

A.    Last Wednesday.

Q.    Who have you spoken to related to this case?

A.    You, Brittany Toomey, Ron Miles, Dave Calderon, Joe Calderon.

Q.    I want to focus on the conversation you had with Ronald Miles.  When did you speak with him?

A.    I spoke with him this past Tuesday night.

Q.    Why were you asked to speak with Mr. Miles?

A.    I was asked to speak with Mr. Miles because we had information that Mr. Miles had law enforcement come to his office looking for Joshua Atwood.

Q.    And what is Ronald Miles' role to Joshua Atwood?

A.    He is his next-door neighbor.  He lives at 1434 Burgettstown, Route 18.

Q.    How did you confirm that you were speaking with Mr. Miles?

A.    I had him show me his driver's license.

Q.    Did Mr. Miles indicate that he had spoken with law enforcement?

A.    Yes.

          MS. VASQUEZ SCHMITT:  Your Honor, objection as to relevance.  I believe a quick proffer as to the relevance.

Jessica Yalenty - Direct

THE COURT:  Could you make a proffer, please.

MS. DYER:  Yes.  Ms. Yalenty will testify about Mr. Miles' interaction with law enforcement and what steps he took subsequent to that to let Mr. Atwood know about his law enforcement contact.

MS. VASQUEZ SCHMITT:  I'm still --

THE COURT:  Do we have a timeframe when the conversation occurred, Mr. Miles' conversation with law enforcement?

THE WITNESS:  Yes.

THE COURT:  At this point I'm directing that question to Ms. Dyer.

MS. DYER:  Yes, we do.

THE COURT:  And what is that timeframe?

MS. DYER:  That timeframe is at the end of March of 2024.

MS. VASQUEZ SCHMITT:  Your Honor, I guess I'm still not grasping the relevance.

THE COURT:  Can you further expound on what the relevance is.

MS. DYER:  Sure.  If Mr. Atwood was made aware that law enforcement was interested in where he lived and speaking with him or arresting him and Mr. Atwood stayed present at the house and did not hide or evade authorities, that goes to the risk of flight.

MS. VASQUEZ SCHMITT:  Okay.  I wasn't getting it.

THE COURT:  That's fine.  Thank you for your explanation.

Please proceed.

Q.   Did Mr. Miles indicate that he had spoken with law enforcement?

A.   Yes.

Q.   When did he say that happened?

A.   At the end of March of this year.

Q.   According to Mr. Miles, what did law enforcement ask him about?

A.   Law enforcement asked him if Joshua Atwood still lived next door to him.

Q.   Did he recall answering that question?

A.   He said yes, Joshua Atwood still lived next door.

Q.   Did he recall who he spoke with?

A.   No.

Q.   According to Mr. Miles, did he tell anybody about the encounter he had with law enforcement?

A.   He told Joshua Atwood and Brittany Toomey.

Q.   According to Mr. Miles, when did he tell Mr. Atwood about this conversation with law enforcement?

A.   April 1 of this year.

Q.   According to Mr. Miles, what did he tell Joshua

Atwood about his conversation with law enforcement?

A.   He told Joshua that law enforcement was essentially looking for him and wanted to know if he still lived next door.

Q.   What did, according to Mr. Miles, what did Mr. Atwood do in response when he learned that?

A.   Mr. Atwood was worried and Mr. Atwood asked Mr. Miles if Mr. Miles had a card of whatever law enforcement agent came to his home.

Q.   And according to Mr. Miles, did he provide Mr. Atwood with that contact information?

A.   No.

Q.   Ms. Yalenty, you had the opportunity to go to 1436 Route 18 in Burgettstown, correct?

A.   Yes.

Q.   That's the home of Mr. Atwood?

A.   Yes.

Q.   When you were in that home, you made observations -- you went into different rooms in the house?

A.   Yes.

Q.   What, if any, child safety mechanisms were you able to observe in the house?

A.   Sure.  There is a gate that separates the kitchen from the rest of the house and with respect to the

layout of the house, it also separates Brittany and Josh's bedroom from the rest of the house as well because the bedroom is to the left of the kitchen and all the other bedrooms are to the right down the hallway.

Q.   Just to clarify.  If we are looking at the house, the parents' bedroom is to our left as we look at it?

A.   Correct.

Q.   The kids' bedrooms are past the kitchen to the right?

A.   Correct.

            MS. DYER:  I have no further questions.

            THE COURT:  Any cross-examination?

            MS. VASQUEZ SCHMITT:  Very, very briefly.

                 CROSS-EXAMINATION

BY MS. VASQUEZ SCHMITT:

Q.   Ms. Yalenty, did Mr. Miles know why the officers were looking for Mr. Atwood?

A.   No.

Q.   So did the law enforcement tell Mr. Miles that Mr. Atwood was a target of an investigation?

A.   I didn't ask him that.

Q.   Fair to say he didn't know -- is it fair to say Mr. Miles didn't know that it related to these federal charges?

**Special Agent Stirrup - Direct (Rebuttal)**

A.    I think that's fair to say.

Q.    So, also, it could be fair to say law enforcement was looking for Mr. Atwood as a witness to a crime?

A.    That could be fair to say.

MS. VASQUEZ SCHMITT:  Thank you.  No further questions.

THE COURT:  Any redirect?

MS. DYER:  No, thank you.

THE COURT:  Ms. Yalenty, thank you very much. You can step down.

MS. VASQUEZ SCHMITT:  Your Honor, I would just like to re-call Special Agent Stirrup for one very brief rebuttal.

THE COURT:  All right.  Agent Stirrup, you are still under oath.

DIRECT EXAMINATION (Rebuttal)

BY MS. VASQUEZ SCHMITT:

Q.    Agent Stirrup, just now did I ask you to look at a website?

A.    Yes.

Q.    What website is it?

A.    Cowtastic Frozen Yogurt.

Q.    What did you see?

A.    A notice on their home page about a grand reopening.

Q.   When is the grand reopening?

A.   Today.

Q.   So is it fair to say they found some other way to service their HVAC needs?

A.   Yes, ma'am.

MS. VASQUEZ SCHMITT:  No further question, Your Honor.

THE COURT:  Any cross?

CROSS-EXAMINATION

BY MS. DYER:

Q.   You don't have any further information than what you saw on the website?

A.   Yes, ma'am.

MS. DYER:  Thank you.

THE COURT:  Agent, you can step down again.

Ms. Dyer, is there any other evidence you wish to present here this morning?

MS. DYER:  No.

THE COURT:  All right.  Then I think we are prepared to move to argument on the issue of detention.

Ms. Vasquez Schmitt, we'll start with you.

MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

I'm going to address the Bail Reform Act factors.

First, I would just like to note with respect

to the Pretrial Services Report and Recommendation, Your Honor, frankly that is just not enough here.  Your Honor has so much more information now than Pretrial Services had.

Pretrial Services does not take into consideration two of the Bail Reform Act factors that the Court considers:  The nature and circumstances of the offense charged and the weight of the evidence against the defendant.  Your Honor has so much more information before the Court.

Your Honor, this defendant should be detained pretrial.  Regarding the nature and circumstances of the offense, the charges in this case are extraordinarily. It's been a few years, so it's easy to forget but the defendant participated in a violent riot that was designed to prevent the United States Congress from certifying valid true results of the 2020 presidential election.

There were people that died there.  There were multiple law enforcement officers injured and massive damage was caused.  Lawmakers were forced to hide and flee from their offices.

The defendant was no mere onlooker, Your Honor.  He personally used multiple dangerous weapons to violently assault multiple officers.  The videos are

frankly to me terrifying with the defendant screaming at officers, using massive force with large poles and lead pipes to assault them. He did this despite the fact he was in an extremely public setting. He was around people filming his behavior. He was in the presence of many additional different law enforcement officers and still he persisted.

Special Agent Stirrup explained the fact that he wasn't arrested until now has nothing to do with how dangerous he is. Despite the fact that obviously there is a lot of FBI agents but there's thousands and thousands and thousands of hours of this footage. They have obviously a lot of other cases. It was just transferred to the Mon Valley office just a few months ago, Your Honor. So the lapse of time does not speak to the dangerousness of this defendant.

Your Honor, I would say the nature and circumstances of the offense, that very much weighs in favor of detention.

Regarding the weight of the evidence, as shown by now the indictment complaint, the testimony and now the indictment, the evidence against this defendant is strong and compelling. He was observed by the U.S. Capitol surveillance cameras, police body worn cameras, and publicly available video attacking police officers

and attempting to unlawfully entered the Capitol and then did unlawfully enter the Capitol.

We heard testimony from the officer who arrested Mr. Atwood.  That's a completely acceptable way for him to identify him and there were other steps taken at the FBI as well.  Your Honor, this factor favors detention.

Regarding the history and characteristics of Mr. Atwood and that's really the meat, right, of most detention hearings.  I think it's interesting that -- I'm going to talk about his criminal history, but in 2021, I mean that car accident, it may seem more like a simple thing but that's only a month.  That was in February, a month after January 6.  He just participated in these assaults and then it's a month later he is in this car accident and he is lying to police.  He didn't know what marijuana smells like.  He was lying to police, getting into an argument with the tow truck driver saying things about Jewish people to the Jewish tow truck driver.  This speaks to his character.

Special Agent Stirrup also testified about the 2011 incident in McDonald, not Franklin, in McDonald, Pennsylvania, where he pulled a gun and shot at someone. This is a dangerous defendant.

We also know he is currently on bond after being arrested for robbery in a malicious assault less than one year ago. He allegedly had a concealed gun and a knife and used that knife to stab a man, one of his clients, in a dispute over money.

He then failed to return law enforcement officer's calls and we heard on my redirect of Special Agent Stirrup, Ms. Toomey admitted he had that number and he had to get rid of it because he was getting too many calls.

There is conflicting evidence about his residences. We heard he just got his driver's license in September of last year, Special Agent Stirrup testified, and it still had the old address. He may have known he was being investigated and this was coming. It's possible he didn't want to switch the address on his driver's license, Your Honor.

The marshal fugitive task force had to be employed to find and arrest the defendant. He was a fugitive for around a month. Certainly that goes to risk of flight.

Here the strength of the evidence in this case and the serious penalties that he is facing, now we have powerful incentives to flee and he has no ties to the charging District of D.C. that I'm aware of.

Your Honor, importantly, and I'm sure it's important to Your Honor in every case, following court conditions.

In his West Virginia case, he was prohibited from having alcohol and drugs, from possessing them and there was testimony that there was alcohol and marijuana and marijuana paraphernalia in his home.  He wasn't following those bond conditions, Your Honor.

There were also guns and there was testimony he had a concealed carry permit.  Your Honor, I didn't know this before last night at 11 p.m., but I found out that it is against Pennsylvania law, it's against Pennsylvania law, the Uniform Firearms Act, to have a medical marijuana card and to have guns.  It's against the law.  You cannot have both.

There is actually a bill right that I saw a bunch of articles about seeking to change that but that is the law right now.

So, Your Honor, he was violating conditions and now we have all this evidence he was violating Pennsylvania law by having these guns in his home and having a medical marijuana card.  It's also a violation of the Uniform Firearms Act to have a concealed carry permit and to have a marijuana card.  You can't have both.

Your Honor, that's extremely important for the Court to understand, and it was something that I was shocked to learn. So he is violating his conditions and he is violating Pennsylvania law and that's an important law. Maybe if you are smoking marijuana, you shouldn't have guns.

Your Honor, this shows a lack of respect for court orders and increases the possibility that defendant may fail to follow this Court's orders and abide by his conditions of release.

I'm also, Your Honor, frankly not sure what West Virginia is going to do. They may violate him and he may be detained on his bond conditions there. So Your Honor may release him, and then he may have to be picked up.

I have no knowledge of what they are going to do but certainly, they will be made aware of what was found in his house in the search but he certainly faces that risk as well in the West Virginia case.

He obviously had access to money. He made bail on a hundred thousand dollars. I admit I'm not fully up on what happened in West Virginia but I believe that would ten grand. So he does have some access to cash which is further evidence of risk of flight.

Your Honor, the employment history, I mean I'm

slightly confused because we saw the exhibit from the Department of Labor.  It's unclear to me if he is working legally or why none of those wages are appearing at the Department of Labor.  It's a bit unclear if that's a legal business.

We saw the evidence of the frozen yogurt.  Clearly, his clients will be able to find other people service to their needs as we saw very clearly the Cowtastic is reopening today.

Your Honor, I don't know to what extent they are going to talk about his traumatic brain injury.  I can save it for rebuttal but I don't believe there has been -- that was in the brief but I don't believe Your Honor has any evidence before this court that he can't receive whatever treatment he needs if detained.

Clearly their exhibits also show he has this detailed bid proposal.  He seems like he is dealing with his injuries very well and is able to function.  So I think their exhibit of the bid proposal shows that traumatic brain injury should not deter the Court from detaining him.

I would also note their exhibit with the pictures of him look strikingly like the pictures in the statement of facts.

Your Honor, it's difficult to fathom a more

serious danger to the community, to the District of Columbia, to the country, to the fabric of American democracy than the one posed by armed insurrectionists, including the defendant, who joined the occupation of the United States Capitol.

Every person who was present without authority on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the vice president, members of Congress, and the peaceful transfer of power.

The defendant's specific conduct greatly aggravated this chaos and danger.  It was designed to intimidate members of Congress and instigate fear across the country and it did.  He was right at the front of that angry, violent mob at the tunnel.  He was leading the way.  He armed himself with multiple dangerous weapons and assaulted multiple officers.

Your Honor, as we're aware, the presidential election this year involves President Trump, he is running again.  The public is still at risk should the defendant's passions become inflamed again.

We heard evidence, unlike some of the cases they cited, he poses a threat regardless of the unique circumstance of January 6 and I already talked about all of that, Your Honor.

Your Honor, the seriousness of the offense and

all of the history and characteristics counsel in favor of detention.

Just briefly regarding his release plan.  I'm sure Ms. Toomey is very loving and a very nice person. I don't think she can really control the defendant.  She wasn't able to stop the January 6.  She wasn't able to stop the alleged assault in West Virginia.  I don't think she is an appropriate third-party custodian for that.

He claims he needs to care and provide for his kids and his unborn child.  Where was his concern for his -- he had a baby on January 6.  We heard about their ages.  Where was his concern for his family on January 6?  Where was his concern for his family last year when he participated in this violent assault and allegedly went with a concealed gun and a concealed knife to West Virginia to collect a debt?  Where was his concern for his family then?

He knew that law enforcement was looking for him.  I guess we don't have any testimony he heard the message but we know messages were left for him.  He still created this dangerous situation.

There have been federal agents, federal marshals at his door twice in the last year.  That's not a good situation for his children and his fiancée.

Your Honor, that's all.  Thank you.  The defendant should be detained pretrial.

THE COURT:  Thank you very much.

Ms. Dyer.

MS. DYER:  Your Honor, I'm asking that the Court allow Mr. Atwood to enjoy the presumption of innocence while remaining tethered to his family, his business, and his community.  Mr. Atwood is committed to following any conditions that this Court imposes and appearing when his case is heard in Washington, D.C.

I won't belabor every point that I made in my written submission but I do think there are a few things that are worth highlighting.

Turning to the 3142(g) factors, first, to address the nature and circumstances of the offense and the weight of the evidence.  I would just point out that while there's been a substantial lapse of time here and I understand that the government has rightfully taken what happened on January 6 seriously but there has been three years that have gone by.

Mr. Atwood has been identified for an unknown amount of time but a number of months.  He was not seen as so dangerous that they had to go and arrest him immediately and he was arrested in his home, which I will talk about more.

The government has presented some of the pieces of their case this week, but there is a long way to go to determine what level of responsibility Mr. Atwood had.

He is entitled to the presumption of innocence and it is not lost on him how serious these charges are, as most cases in federal court are.

I would like to point out and in my written brief I did point out cases where individuals faced similar charges and were in the community pretrial without incident.  I think the most important thing to take away from, the government tried to distinguish with a couple of facts from each case while it's not the same situation as Mr. Atwood but that's what gets fundamentally down to what D.C. district courts have done, which is developed this individualized analysis that is not about just what charge it is or that's it's violent in nature as an allegation.

People that have been charged with violent charges including the charges that Mr. Atwood face have been released into the community without incident.

The government cited to U.S. v. Krol, which does outline, and I'm happy to provide a copy to the Court, what has been nicknamed the Chrestman factors, to consider -- for district courts to consider in this

individualized assessment and that there is no one factor that should lead to the Court detaining an individual.

So that's why I provided several cases where an individual was charged with 18 U.S.C. 111(a)(1) and (b)(1) and still determined to be a good candidate for release as Pretrial Services has deemed.

So those factors, there has not been evidence presented that Mr. Atwood engaged in any prior planning prior to arriving at the Capitol and whether or not he was at the Capitol is still up in the air.

There has not been evidence presented about Mr. Atwood coordinating with other participants before, during, or after.  There's no social media presence. There is nothing that shows that there's been any allegation of a continuation of conduct or actions that would give this Court concern.

There has not been evidence that Mr. Atwood assumed a leadership role or encouraged other rioters.

There are factors that the government has presented some evidence on and I think we will -- I will speak to the weight of the evidence.

But the other factors just to let Your Honor know, and I'm happy to provide the case, and obviously, it's in the government's briefing, that he has been

charged -- one of them where he has been charged with felony or misdemeanor charges, which is everybody that is asking for bond, whether or not you carried or used a dangerous weapon and how the word and movements threatened officials.

More time will be needed to dedicate to that but that half of the factors weigh in favor of release while some factors obviously weigh toward detention.

It's important -- I do want to highlight there has been no allegations that Mr. Atwood has been involved in any movement since -- before or during or since January 6. He is not a member of Proud Boys, Oath Keepers or any malicious group.

To speak a little bit to the weight of the evidence, as many courts have held, and I will just cite U.S. v. Klein, 533 F. Supp 3d1, which is a district court case, that the weight of the evidence factor is the least important of the 3142(g) analysis.

That said, I understand Mr. Atwood has been indicted. This is not a preliminary hearing, but I think that some of the concerns with the investigation in this case will go to the admissibility and weight of evidence that the government is able to proceed on.

We did not hear evidence about how facial recognition was used and how it was verified. We did

not hear information about how the FBI verified or came to have publicly available information.  We did not hear about how information that was obtained from the Internet or publicly was authenticated by the FBI.  We have no independent verification.

I do take issue with the way that Mr. Atwood was identified by Officer Blankenship.  I believe there is a phone call, at the very least an email, and that email included Mr. Atwood's driver's license picture combined with the pictures that Agent Stirrup hoped to have identified.

I think a proper identification would have been one, can you identify who Joshua Atwood is and, two, can you identify the person in these photos without me saying Joshua Atwood and his date of birth.

If you gave that information to my grandma, she would probably say the same thing because it was all spelled out in the identification.  It was overly suggestive.

Briefly, I have concerns about the open source video.  We live in a world where Joe Biden's voice is used to say things that he didn't say when we piece it together using artificial intelligence and editing.

We have videos that are from people who are supposedly at January 6, 2021 and we don't have any

verification for whether or not those videos have been edited.

So, I'm asking the Court to weigh some of the issues with the investigation because ultimately, it goes to whether or not the government will be able to prove their case beyond a reasonable doubt.

I would also ask the Court to give limited weight to any information provided by Agent Stirrup about Mr. Atwood's 2011 misdemeanor conviction. Her testimony was not based on any report. It was based on a phone call with a police chief who we don't know what the level of his direct involvement was with the charge. We don't know if he was the drafter of any document.

While the Rules of Evidence are obviously very relaxed in hearings like this, they are nonexistent. There is a lot of layers of hearsay there and not a lot of information about what actually happened as the case proceeded based only on a phone call.

Obviously, we agree that the history and characteristics of Mr. Atwood are incredibly important here and so through our written briefing and here today, we have presented a snapshot of who he is, what he means to his family and his community.

The government has tried to apply a kitchen sink approach including allegations regarding parenting

and comments made, his potential political beliefs, but none of those are reasons he would be a flight risk or a danger to the community.  I ask Your Honor to put a very low, if any, weight on that.

In fact, Joshua Atwood is somebody who takes care of the people who need cared for in his life.  It's his five-year-old daughter and his two-year-old son, it's his partner, Brittany Toomey, who is here today both during and after her pregnancies as coparents, as a loving couple.  It's helping his next-door neighbor.  He approaches his life and his work with compassion and in a supportive way.

He has been future looking.  Since he started his apprenticeship with David Calderon whose letter is Exhibit A.  I would like to note that he was present in court on Wednesday.  He had a health emergency about a week ago and wasn't physically able to come here today but obviously he is somebody who Mr. Atwood can rely on as a source of support, as a source of somebody who will accompany him to any court appearances he has in Washington, D.C., and I just want to note that he couldn't be here today, Judge.

Mr. Atwood has been forward looking since he started his apprenticeship.  He worked at that apprenticeship for very little money when he started.

Mr. Calderon took him under his wing because Mr. Atwood's father was not a part of his childhood and agreed to be a part of his adulthood and Mr. Calderon has taken him under wing.

Pretrial Services and I have verified he that earns a very modest living but continues to grow his business through incredible hardship.

I'm not sure why the Department of Labor printout is missing it, maybe for the same reason that when we search NCIC, not everything always comes up, but I personally have reviewed financial documents both with regard to the eligibility for Mr. Atwood to receive the services of the Federal Public Defenders Office and to confirm his business and I have offered those to be made available to Pretrial Services in that process.

I do think it's important, and it's mentioned in many of the letters, that in the last two years, Mr. Atwood has suffered a traumatic brain injury stemming from a car accident that he was in, in December of 2021. His medical providers have worked diligently to help him complete different forms of physical therapy. He had to have elbow surgery. He had occupational therapy after that. He had to have ocular therapy, motion therapy. He continued to have debilitating headaches and fatigue and was evaluated and

received cognitive therapy, psychological therapy, all stemming from this accident.

So his doctors have tried different medications.  I did provide to Pretrial Services his medical marijuana card which is something that his psychiatrist prescribed for him.

Despite all that, Mr. Atwood works.  He works because he is the financial provider in his family.  He nurtures the relationships that he has with clients from doing walk-in refrigeration for dairy farmers to gas stations and helping Ms. Klein with her specialty freezer yogurt machines.

There are times that Mr. Atwood doesn't charge his clients because he knows they can't pay and sometimes Brittany gives him a bit of a hard time for that.

Those that work with Mr. Atwood and his treatment and describe him as open to learning, motivated for treatment and growth, stable and supportive and he feels those things from the community he has around him as well.

It's in the documents but the community will feel a loss without him.  They rely upon him as somebody who is a friend, a neighbor, a businessperson who may be able to delay a payment or delay a bill.  I would just

note, Your Honor, he is out on bond in a case involving serious felony charges in West Virginia because he is presumed innocent.  I am not his attorney in that case. I can't speak with too much detail to that matter.  I have to be protective but we did provide Your Honor with a letter from his attorney in that case, Kevin Pearl, who has indicated that Mr. Atwood has always remained communicative.

In fact, Mr. Atwood insisted that I call his attorney because the day he got arrested in this case, he was supposed to appear in court the next day.  He was very concerned about it and very prepared to attend that court date and, in fact, when he was arrested, he put his court clothes on, which is what he has not today but when he was arrested.

I don't feel I can say too much on the record but I will say, as confirmed by Agent Stirrup, there is zero allegation that Mr. Atwood used or threatened to use a firearm in any way which I think cuts toward the defense that he is building; that there has been a preliminary hearing and in that preliminary hearing, there was admissions about who the complaining witness is the one that started the physical fight.

So what we can take from that case is that Mr. Atwood has proven himself to be not a flight risk.

With regard to the testimony about the phone messages and the phone calls, again, that only shows that Mr. Atwood stays put.  He didn't go live somewhere else.  He didn't go hide.  He didn't leave town.  He was at his home with his family and that's what he did in the May 2023 West Virginia case and that's what he did in this case.

You heard testimony that he was made aware that the federal government was looking for him and he didn't leave.  He didn't dodge.  He asked for the contact information and wasn't provided it, so he couldn't do anything further with it.

Your Honor, Brittany Toomey is willing and supportive and willing to take responsibility for Mr. Atwood's compliance with any conditions imposed.

I know she has had a conversation with me and with Pretrial Services about what that entails but she would need to notify the Court if Mr. Atwood were to violate any of those conditions.

I would just note that Pretrial Services has interviewed him, done the risk assessment, looked at what the course of this case is and the West Virginia case and has laid out a number of conditions that they believe will assure the safety of the community and the presence of Mr. Atwood in court.

I just want to end by saying that there has to be a concrete prospective threat to public safety that cannot be mitigated by pretrial supervision. I believe that the conditions that pretrial supervision has proposed would mitigate any concern that this Court would have.

So we're asking that you release him to suitable conditions that the Court sees fit, to let him be the dad, fiancée, and the HVAC small business owner that the community relies upon.

He has the tools and the support to succeed on pretrial release. He has shown himself to show up to Court even when he is facing serious charges and he will abide by the Court's orders.

Thank you.

THE COURT: Thank you, Ms. Dyer.

Ms. Vasquez Schmitt.

MS. VASQUEZ SCHMITT: Very brief rebuttal.

I would ask the Court not to consider the traumatic brain injury at all. There is literally zero evidence before Your Honor about that or about any rehab. I mean just because it's in a brief doesn't mean there is actual facts before Your Honor. There was no testimony, not a single document. They had like Ms. Toomey's medical docs but there is not a single

document before Your Honor.  So I would ask Your Honor not to consider any of the arguments about the traumatic brain injury.

Ms. Dyer, also, I would just object to all of the things that she said that weren't before the Court through testimony or documents such as he was in his court clothes, such as Ms. Toomey nudged him here and there.  None of that was evidence that was actually presented to the Court.  I would ask the Court to just disregard those portions of Ms. Dyer's argument, Your Honor.

With respect to the argument about open source, we saw body worn camera, we saw CCV footage as well.  It's not just this conspiracy IA against Mr. Atwood, Your Honor.

I would dispute that he did not have a leadership role.  Your Honor, we saw the videos.  He was encouraging other actors with his conduct, certainly, that he was right in front there in the tunnel.

Finally, I did put a very short document on the record about distinguishing the cases.  I would point out none -- I didn't really hear Ms. Dyer disagree -- none of those cases involve the same conduct here.  None of those cases involved this many assaults, this many weapons, all of the allegations that Your

Honor has before you and in those cases, it was home detention.

So to the extent the Court is thinking about what those judges were thinking and now looking at some type of incremental steps if those people got home detention, this defendant should get detention, Your Honor.

Thank you.

THE COURT:  All right.  Thank you.

We're going to take a brief recess for about ten minutes.  We'll see everyone back here at 12:30.

At that point, I will make my findings and conclusions.

Thank you all.

(Whereupon, a break was taken.)

- - -

(12:35 p.m.  In open court.)

THE COURT:  Thank you for your patience while I dealt briefly with another matter.

As an initial matter, I want to note that this matter does come before the Court based on the government's request to detain Mr. Atwood pending trial.

Of course, I'm guided by several principles, including the fact that at all times during this proceeding and as noted in my findings and conclusions,

Mr. Atwood is entitled to the presumption of innocence.

As counsel has noted, I am also required to follow the conditions imposed in the Bail Reform Act and to consider those elements in making my decision and must determine whether or not there are conditions or a series of conditions that will reasonably assure the safety of the community and/or reasonably assure Mr. Atwood's appearance.

In this regard, somewhat more unusual than normal, we started out here with a criminal complaint. The statement of facts attached to that criminal complaint certainly has been reviewed and considered by me and just yesterday, we had an indictment issued.

So I reviewed both of those documents and everything else that the parties have provided to me in connection with this matter.

I want to turn to the four factors that I am required to consider in this case.

The first being the nature and circumstances of the alleged offenses that are charged in the indictment.  I think it's fair to say there's been a substantial amount of evidence about the nature of the offenses charged.  There was significant testimony provided by Agent Stirrup who began her investigation in January of this year.

There were videos presented after the groundwork was laid for the events of January 6, which I'm sure everyone in this courtroom are familiar with in one way or another.

I'm not going to even attempt to summarize all of the evidence in the statement of facts attached to the criminal complaint or in the various videos that were shown, but we do know that there was a large crowd gathered at the Capitol on January 6.

Based upon a number of different type of video including body cams worn by police officers, cameras that were present in the Capitol and so-called open source videos that were provided by others, it appears fairly clear to me that Mr. Atwood can visibly be seen in certain clothing, including dark pants, several jackets, a Trump 2020 shirt, gloves and a backpack and that was in images 4, 5, 7, and 9.

There was identification of Mr. Atwood through face recognition. The videos that were shown and, again, I'm just summarizing some of the videos, all of which appeared to have been between a certain timeframe on January 6 depicted what appears to be Mr. Atwood throwing a bottle that struck a police officer, using a pole which also hit officers, using a wooden pole -- what appeared to be a wooden pole to stab at a police

barricade, ultimately striking two officers in the neck, the use of what appears to be metal scaffolding and riot shield allegedly causing the striking of a trooper's head and neck.

The videos from inside the Capitol reflected what appears to be Mr. Atwood throwing this metal piece which has been described as scaffolding, as well as a pipe and a speaker. Specifically, I'm referring at various times here to Exhibits 9, 10, 11, and 12.

I consider the assault of police officers, the entry into the Capitol, and as well while perhaps we don't know that the person alleged to be Mr. Atwood had any advanced planning here, we do know that he was not a person that just came to the Capitol that day and stood outside, which people are entitled to do and make remarks, which they are entitled to do.

Here we know that he was in the front of the group at a particular entrance in the lower tunnel and appeared to be, if not a leader, certainly a person who was substantially involved in attempting to enter the Capitol, attempting to assault police officers, and using various devices and what you could refer to as weapons as part of that.

So I consider the nature and circumstances of the alleged offenses -- again, Mr. Atwood is entitled to

the presumption of innocence -- to be extremely serious here.

In terms of the weight of the evidence, I talked about that a little bit already but I do find here that the weight of the evidence is strong.

In addition to the grand jury returning an indictment reflecting that the grand jury concluded that there was probable cause that these offenses were committed. We also have the depiction of various videos and the identification of Mr. Atwood.

Certainly, if there are issues about the identification of Mr. Atwood, I'm confident they will be addressed as this case goes along, but in terms of my view, it certainly appeared to be Mr. Atwood involved in these activities and the photos that were shown as part of the statement of fact in the criminal complaint I believe also reflected his identity.

I want to make sure that I have nothing else I want to say about the weight of the evidence but I don't believe so.

Let me next turn to the history and characteristics of Mr. Atwood. In this regard, I did review the Pretrial Services Report. I also reviewed all of the exhibits that were entered here, including the exhibits offered by Ms. Dyer in support of

83

Mr. Atwood's position here.

I think what we know from those is that Mr. Atwood is a resident of Burgettstown.  He has had two different addresses, one of which was identified on some of his identification but is not his residence.  He certainly has ties to the community here.  He lives with Ms. Toomey.  They have two children together and a third one along the way, and Mr. Atwood would like to return to that residence.

There is a reference in the Pretrial Services Report to a car accident in which Mr. Atwood is alleged to have sustained a traumatic brain injury and I don't have any reason to doubt that but I also don't have any evidence presented to me about what his treatment may have been for that but certainly, I do note that.

Mr. Atwood worked for a number of years for Dave's Heating and Cooling and certainly we have a letter from Mr. Calderon in support of Mr. Atwood, which I have reviewed.

I have also reviewed the exhibits about the work that Mr. Atwood has done for various customers of his, and I do acknowledge that there's some further evidence about that in the exhibits, including a letter from I believe it's Ms. Klein who is a client of his.

I do note that she references what she

believes are the results of his accident which include a low frustration tolerance.

I've also reviewed the letter from Ms. Toomey and note that she was offered as a third-party custodian but was not presented to me for my evaluation of that.

In terms going back to employment, it appears that starting in late 2020, Mr. Atwood began his own business, also performing the same type of work.  I know there is an absence of any income from the Department of Labor and honestly, I don't think any of us know why that is but I did review the information about that.

I've also reviewed Mr. Atwood's criminal history because that is part of the Pretrial Services Report and there was certainly some evidence presented here today about some of that criminal history and I want to review that briefly.

With respect to the incident that is alleged to have occurred in June of 2011, that appears to have related, at least according to the testimony that I heard, of an individual who was attempting to repossess a motorcycle.

According to at least the evidence that I heard at that point, someone identified as Mr. Atwood fired a handgun near that individual and then pointed a handgun at that individual and I note that there was a

guilty plea entered in that case in 2012 and a sentence of 24 months probation.

There was also some testimony about a car accident in early 2021 for which there were charges issued for disorderly conduct.  We don't have a whole lot of information about that other than what I heard here today which relates to the possibility of the odor of marijuana in the vehicle that Mr. Atwood was driving at the time and Mr. Atwood's denial that he knew what marijuana smelled like, and I will note that incident occurred about six weeks or less after the January 6 events at the Capitol.

There is also the pending arrest for malicious assault, robbery and malicious wounding which is alleged to have occurred on June 7 of 2023 in West Virginia.  I note from what I heard about this incident that apparently and, again, allegedly, Mr. Atwood went to a location of someone that he had done some work for. There was some sort of fight that may have ensued. Mr. Atwood was carrying a firearm and apparently also a knife and that the victim in this case allegedly was stabbed and certain money was taken out of the cash register.

That charge is pending as I've noted. Certainly I did see the letter from the attorney who is

representing Mr. Atwood in that case who indicated that he has appeared for his various proceedings.

There was also some evidence about what the conditions of release were in that case and in addition to a bond, there were conditions, as I understand it, of no alcohol and no narcotics.

The photos taken from the home show that apparently there was the presence of alcohol in the home and at a minimum, a bong sitting on a nightstand table and in addition to that, there was evidence when the home was searched, of three firearms in the home, one firearm -- there's some discrepancy in this but either one firearm registered to Ms. Toomey and the other two not registered to anyone or Ms. Toomey indicates they were all registered to her and I don't have a way to reconcile that.

In addition to that, there was body armour in the safe where the guns were located.  I think it's rather unusual for somebody who is not in law enforcement to possess body armor but I don't know anything more about why that was in there.

So those are the factors I considered with respect to the history and characteristics of Mr. Atwood.

I also acknowledged that he is in a stable

relationship and has several children and one on the way.  I think I referenced that earlier.

Looking to the fourth factor which I'm required to consider which is the nature and seriousness of the danger to others in the community.  I'm looking significantly in connection with that factor to the charges in this case which don't just involve going to the Capitol and being unhappy about the results of the election but involve active participation in assaulting or allegedly assaulting law enforcement officers using various devices and then entering into the Capitol through a window that was broken.

I consider that to be a significant danger to others in the community and I will note that there is a troubling history, while Mr. Atwood does not have a substantially lengthy criminal history, there is a troubling history of acting against authority, including someone who is repossessing a car, including getting into an auto accident and resulting in disorderly conduct, including taking a gun and a knife to a location where a customer was located for the alleged apparent purpose of obtaining money from that client.

I think it does represent a danger to the community when one thinks that one can take any conduct necessary to keep -- to attempt to keep property or get

property.

So, armed with all of that evidence, I don't find that Mr. Atwood is a risk of flight in any significant way here but I do find by clear and convincing evidence that there are no conditions that will reasonably assure the safety of others in the community and, therefore, I am ordering that Mr. Atwood be detained pending trial.

Ms. Vasquez Schmitt, is there anything else that you wanted to address?

MS. VASQUEZ SCHMITT:  No, Your Honor.  Thank.

THE COURT:  Ms. Dyer?

MS. DYER:  No, Your Honor.

THE COURT:  All right.  I appreciate everyone's attention to this matter and excellent presentations and with that, we are concluded.

(Whereupon, the above detention hearing was concluded.)

- - -

I hereby certify by my original signature herein, that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

S/ Karen M. Earley
Karen M. Earley
Certified Realtime Reporter